UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHATINA GRADY and DANIEL
GRADY,

     Plaintiffs,

v.

SGT. DEPUTY JOHN
CRATSENBURG, DEPUTY
AUSTIN PEARSON, DEPUTY
DANIEL BUFFA,

     Defendants.

_____ /

Case No. 22-cv-11142

Hon. F. Kay Behm
United States District Judge

Hon. Kimberly G. Altman
U.S. Magistrate Judge

## OPINION AND ORDER ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT (ECF No. 69)

     This case is about a married couple's claims of false arrest,

excessive force, and retaliation for their First Amendment expression

when they were jointly arrested involving use of force after they filmed

a police encounter, yelled at police, failed to back away from an active

investigation, and resisted arrest in May 2020.  Because they stood at a

distance while they filmed and shouted at police, the court finds that a

reasonable jury could rule in their favor as to their First Amendment

retaliation claim, and that qualified immunity does not bar that claim.

However, qualified immunity does bar relief on Mr. Grady's excessive

force claim as to taser use, Ms. Grady's active resistance to arrest bars her excessive force claim as to fist strikes, and the existence of probable cause for failure to comply with a lawful order prevents recovery for the rest of Plaintiffs' claims.

## I.   PROCEDURAL HISTORY

This matter is before the court on Defendants' Motion for Summary Judgment (ECF No. 69).  Plaintiffs Shatina Grady and Daniel Grady (jointly the "Gradys")[1] filed suit on May 24, 2022, against Defendants John Cratsenburg ("Cratsenburg"), Austin Pearson ("Pearson"), and Daniel Buffa ("Buffa"), as well as former Defendants Washtenaw County Sheriff's Office, Ypsilanti Police Department, and Bryan Gerwig, and this case was assigned to the Honorable Judith E. Levy.  ECF No. 1.  The Ypsilanti Police Department was dismissed by the parties' stipulation and order of the court on January 4, 2023.  This case was reassigned to the undersigned pursuant to Administrative Order 23-AO-003 on February 7, 2023.  Following a motion to dismiss

---

[1]At times in the court record, Plaintiffs are referred to, or their names are spelled as, Sha'Teina Grady-El and Daniyal Grady-El (or similar alternative spellings).  For consistency, and after consultation with Plaintiffs' counsel on the record, the court uses the spelling used on the First Amended Complaint (ECF No. 46).  When alternate spellings are used in this opinion, they are used when citing to the record.

by the Washtenaw County Sheriff's Office ("WCSO"), Magistrate Judge Altman recommended that WSCO be dismissed because Plaintiffs failed to state a claim under Rule 12(b)(6) (ECF No. 31).  This court accepted and adopted that recommendation, dismissing WSCO from the case on September 1, 2023 (ECF No. 45).  An amended complaint was then filed (ECF No. 46).  Bryan Gerwig was also dismissed by stipulation of the parties and order of this court on November 15, 2024 (ECF No. 78).  The remaining (current) Defendants – Buffa, Cratsenburg, and Pearson – filed a Motion for Summary Judgment on all claims on October 16, 2024 (ECF No. 69).  Plaintiffs responded (ECF No. 75), and Defendants filed a reply (ECF No. 79).  The court held oral argument on December 12, 2024, at which counsel for all parties were present, and this opinion follows.

For the reasons set out below, the court **DENIES** the motion as to Count I but **GRANTS** the motion as to all remaining counts. Defendant Buffa is **DISMISSED** from the action in full.

## II.    FACTUAL BACKGROUND

This case arises from the Gradys' arrests by Defendants Cratsenburg and Pearson, police officers with the Washtenaw County

Sheriff's Office ("WCSO").  Shortly after midnight on May 26, 2020, all

three Defendants responded to a call regarding a shooting in Ypsilanti,

Michigan.  ECF No. 69-5, PageID.1992-93.  A witness informed deputies

that the shooter had entered a nearby house.  *See* ECF No. 69-3,

PageID.1742; ECF No. 69-5, PageID.1974.

Police surrounded that house and Defendant Buffa, also with

WCSO, began speaking with an occupant through a front window,

seeking permission to enter to search the home for the shooter.  As

neighbors gathered to watch, the Gradys filmed the police from the

sidewalk nearby.  Shatina Grady yelled from a distance at the officers

that police needed a warrant to enter, asking to see a warrant, and

other similar phrases.  Daniel Grady occasionally joined in.  Pearson

and Cratsenburg told the Gradys that they were standing too close and

repeatedly ordered them to back up.  After the occupants of the home

refused to allow officers to enter without a warrant, Defendants

Cratsenburg and Pearson went to arrest Plaintiffs for interfering with

and/or obstructing an investigation, and a struggle ensued before the

Gradys were handcuffed and arrested.  The Gradys were criminally

charged with assaulting, resisting, or obstructing a police officer under

4

Mich. Comp. L. § 750.81d(1); Shatina Grady was also charged with a violation of § 750.81d(2) (causing a bodily injury to an officer) and malicious destruction of police property under Mich. Comp. L. § 750.377b (damaging the interior of the police cruiser while inside it). Plaintiffs were acquitted on all criminal charges by a jury in January 2024.  The Gradys brought this civil suit under 42 U.S.C. § 1983 and related state law claims in May 2022, which was ongoing while their criminal charges were pending.

Defendants have provided various exhibits in support of their motion which aid in providing an accounting of the events at issue. These include body cam videos from Pearson (Defendants' Exhibit 3, ECF No. 69-4) [hereinafter Pearson Bodycam at [timestamp][2]], Cratsenburg (Defendants' Exhibit 6, ECF No. 69-7) [hereinafter Cratsenburg Bodycam at [timestamp]], as well as an interior Vehicle Camera (Defendants' Exhibit 10) [hereinafter Vehicle Cam at

---

[2] For clarity, the court uses the timestamps on the original videos themselves, not the timestamp of the clipped portion.  For example, on Pearson's bodycam, at the beginning of the media exhibit provided, the top right of the screen reads 2020-05-26 00:20:18 -1400.  The court uses the timestamp 00:20:18 as its reference. Timestamps are often used in this opinion with one colon (e.g., 00:00).  When provided in that form, there are two (deleted) leading zeros (e.g., 00:40:00 becomes 40:00).

[timestamp]].  All are available as media files.  Also relevant are the trial transcript from the Gradys' criminal trial (Defendants' Exhibits 4 and 5, ECF Nos. 69-5, 69-6) [hereinafter Trial Tr. Vol. I or II at [page]], Shatina Grady's deposition transcript (Defs' Exhibit 8, ECF No. 69-9) [hereinafter Shatina Grady Dep. at [page]], Daniel Grady's deposition transcript (Defs' Exhibit 9, ECF No. 69-10) [hereinafter Daniel Grady Dep. at [page]], and the transcript of the Gradys' preliminary exam in state court (Defs' Exhibits 7, 12, ECF Nos. 69-8 (Vol. I), 69-13 (Vol. II)) [hereinafter Preliminary Exam Vol. I or II at [page]].

What follows is a more detailed accounting of those events based on the parties' testimony, the video evidence, and other exhibits.

## A.    Police investigate a shooting and seek entry to a house

Defendants responded to a call regarding a shooting at a block party on Peachcrest Street in Ypsilanti, Michigan.  ECF No. 69-5, PageID.1992-93.[3]  Deputies canvassed the area and found a woman with a gunshot wound in a vehicle.  As one deputy administered aid, the

---

[3] Trial Tr. Vol. I at 186 (Buffa testimony).

woman informed deputies that the shooter had entered a house down the street at 2714 Peachcrest.  ECF No. 69-6, PageID.2233.[4]

Buffa arrived on the scene and approached the home at 2714 Peachcrest with other officers, who surrounded the house.  ECF No. 69-5, PageID.1993.[5]  Buffa was the officer assigned to make contact with the people inside; he then spoke with a woman through the front window of the home while other officers surrounded the house.  *Id.* at PageID.1994-95.[6]  As the officers stood in position and Buffa spoke with the woman inside, spectators gathered on the sidewalks and street nearby.  *See id.* at PageID.1996-97.[7]

Buffa's intent in speaking with the homeowner was because, all agree, no exigent circumstances existed to enter the home without a warrant.  *See* ECF No. 69-5, PageID.2006.[8]  The officers did not have a warrant, but police can still search a home without a warrant with

---

[4] Trial Tr. Vol. II at 44 (Turpin testimony).  Turpin was another officer on scene and is not a defendant in this case.

[5] Trial Tr. Vol. I at 187 (Buffa testimony).

[6] Trial Tr. Vol. I at 188-89 (Buffa testimony).

[7] Trial Tr. Vol. I at 190-91 (Buffa testimony).

[8] Trial Tr. Vol. I at 200 (Buffa testimony).

proper consent.[9]   The officers sought that permission in this

conversation.  ECF No. 69-6, PageID.2236.

## B.    The Gradys arrive on scene, start filming, and argue
        with police

Though unknown at the time to any Defendant, the house they

were investigating and seeking entry to belonged to Jaquisy Diggins,

Shatina and Daniel Grady's daughter.  The Gradys lived only a few

houses down at 2744 Peachcrest.  ECF No. 69-9, PageID.2598, 2600;[10]

*e.g.* ECF No. 69-5, PageID.2013 (officers learned their familial

relationship afterward).[11]  The Gradys had heard a gunshot down near

their daughter's house and earlier walked down to her house; when they

heard people calling the police, the Gradys returned to stand in their

own front yard.  ECF No. 69-9, PageID.2675-86.[12]  A neighbor then

---

[9] The search of property without a warrant or probable cause, but with proper consent voluntarily obtained, does not violate the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *United States v. Clutter*, 914 F.2d 775, 777 (6th Cir. 1990), *cert. denied*, 499 U.S. 947 (1991) ("[a] search does not violate the Fourth Amendment where police obtain consent to search from one who possesses common authority over the premises.").

[10] Shatina Grady Dep. at 15, 17.

[11] Trial Tr. Vol. I at 207 (Buffa testimony).

[12] Shatina Grady Dep. at 92-103.

came and told them that the police were seeking entry to their daughter's home.  The Gradys then walked back down the sidewalk towards their daughter's house, stopping at the corner of 2714 and the neighboring house.  *Id.* at PageID.2686-89.  Pearson confirms this account, saying that "two individuals approached from the -- they approached from the east side of the perimeter."  ECF No. 69-5, PageID.2030.[13]  The Gradys are indistinctly visible as they walk up on Cratsenburg's bodycam footage.  Cratsenburg Bodycam at 41:55-42:12. Shatina Grady can be seen walking along fence line to the corner of property.

By the time the Gradys walked up, police vehicles were out on the street in front of 2714 Peachcrest, and officers were in the driveway and stationed around the house.  ECF No. 69-6, PageID.2281.[14]  Buffa was, as explained, at the front window speaking with someone inside. Pearson puts it like this: "at that point, we're basically holding a perimeter on the street, trying to keep people away as much as we can."

---

[13] Trial Tr. Vol. I at 224 (Pearson testimony).

[14] Trial Tr. Vol. II at 92 (Cratsenburg testimony).

ECF No. 69-5, PageID.2026.[15] "The perimeter was basically the entire property of Peachcrest. There was the driveway where my – where I was in. There were deputies at the north end of the street behind vehicles. And due to us not having enough deputies, we only had a patrol car on the east side where the [Gradys walk] up." *Id.* at PageID.2030-31.[16] There was no police tape or other markers put up establishing this perimeter. *Id.* at PageID.2113. One officer was stationed directly across the street with a long gun behind a vehicle; his role was to provide cover to the officers from a distance. ECF No. 69-6, PageID.2281.[17] Another officer was stationed with him because spectators had gathered around that same spot across the street. *Id.*

Because some of the question of the Gradys' alleged interference or obstruction relates to the officers' orders for them to "back up," multiple accounts exist describing exactly where the Gradys stood when they walked up to 2714 Peachcrest, with only slight variations between them. Shatina Grady describes their location as next to the fence in

---

[15] Trial Tr. Vol. I at 220 (Pearson testimony).

[16] Trial Tr. Vol. I at 307 (Pearson testimony).

[17] Trial Tr. Vol. II at 92 (Cratsenburg testimony).

front of the next-door neighbor's house, near or at the corner of her
daughter's lot.  ECF No. 69-9, PageID.2689, 2692.[18]  Daniel Grady
describes their position as "past the fence line, probably right in front of
their police cruiser."  ECF No. 69-10, PageID.2914.[19]  A fence line
separates the two properties; in his account they stood on the side of the
fence line closer to the neighbor's house.[20]  Cratsenburg puts them at
the fence line, by the "southeast corner of the property line by the fence
and sidewalk."  ECF No. 69-13, PageID.3081, 3092.[21]  Pearson says
there was "a patrol car at the end of the next property where the one
that we were surrounding was" and puts the Gradys "just in front of the
patrol car," "right at the fence line, so, they were within our perimeter
that we had set up."  ECF No. 69-8, PageID.2466-67.[22]  Cratsenburg at
one point placed the Gradys "standing on the grass right next to the

---

[18] Shatina Grady Dep. at 106, 109.

[19] Daniel Grady Dep. at 88.

[20] *Id.*  At times, the use of phrases such as "past" the fence line, "on the other
side" of the line, "beyond" the line do not clearly indicate a direction.  At this stage,
and in light of the video largely confirming his account, the court construes any
ambiguity in his favor and assumes he is on the neighbor's side of the fence.

[21] Preliminary Exam Vol. II at 76, 87 (Cratsenburg testimony).

[22] Preliminary Exam Vol. I at 15 (Pearson testimony).

sidewalk" (ECF No. 69-6, PageID.2284),[23] but he later disavowed that

portion of testimony.  ECF No. 69-6, PageID.2309-10.[24]  The video

confirms the basic area.  The clearest view is when the officers move

towards the Gradys, though they are also at times visible on the

bodycams in the distance.[25]  The Gradys appear to stand on the

sidewalk in front of the police cruiser situated at or around the property

line/fence line between the two houses.  *See* Cratsenburg Bodycam at

46:29-32; Pearson Bodycam at 46:29-32.  The point is that there is about

---

[23] Preliminary Exam Vol. II at 95 (Cratsenburg testimony); *see also* ECF No. 69-5, PageID.1997, 2012, Trial Tr. Vol. I at 191, 206 (Buffa testimony) (placing the Gradys in the front yard); ECF No. 69-6, PageID.2270 (Turpin testimony) (stating that Shatina Grady was not on the sidewalk, but in the front yard).

[24] Trial Tr. Vol. II at 120-21 (Cratsenburg testimony); *see also id.* at PageID.2284, 2291, 2316 (placing them on the sidewalk); ECF No. 69-10, PageID.2914, Daniel Grady Dep. at 88 ("I was never in their yard."); ECF No. 69-5, PageID.2030, Trial Tr. Vol. I at 224 (Pearson testimony) ("[T]hey were along the sidewalk up to the driveway of the next house over.").

[25] For most of the encounter, Pearson's bodycam footage does not clearly depict the Gradys at all – most of the time, only their voices are heard; the videos are pointed mainly at the house (Pearson's camera, facing the house behind a red vehicle, mostly shows the red vehicle).  They do appear indistinctly in the lower left corner of Cratsenburg's bodycam footage.  *See, e.g.*, Cratsenburg Bodycam at 42:30-45:20.  Mr. Grady appears to be behind the fence line; Shatina Grady appears to be right at or right behind the fence line.  *See id.* at 43:36, 44:05.  Before the encounter proceeds to an arrest, they are only visible for an instant on Pearson's bodycam.  *See* Pearson Bodycam at 45:14, 45:50.  In those seconds, it similarly appears that Daniel Grady is clearly behind the fence/property line, while Shatina's exact position is unclear or possibly a foot or two within the property line.

a five-foot-wide area where the Gradys stood, and all agree that was the area near the corner of the property police were investigating, right about at the fence line, which placed them near the front of a patrol car which was parked in the street, facing the 2714 Peachcrest property. Other spectators present stood across the street behind the police cars on the front lawn of the house opposite from 2714 Peachcrest. *See* Cratsenburg Bodycam at 46:20.  All agree that until the officers walked over to the Gradys, there was no officer at the corner of the property where the Gradys stood.  ECF No. 69-5, PageID.2089.[26]

Once standing somewhere near the corner of the property, the Gradys took out their phones and started filming.[27]  At this point, Cratsenburg is positioned on the side of the house, a few feet away from

---

[26] Trial Tr. Vol. I at 283 (Pearson testimony).

[27] For purposes of this motion and construing all ambiguous facts in their favor, the court will assume they did so.  Whether the Gradys actually filmed anything at all, or what happened to the videos they did take, is not clear from the record before the court.  Daniel Grady alleges that he had only a short video on his phone, which was no longer there by the time of his deposition, and Shatina also had no video of the event on her phone by the time of her deposition.  ECF No. 69-10, PageID.2889 (Daniel Grady Dep.) (testifying that he gave a copy to his criminal defense attorney and the rest "disappeared"); ECF No. 69-9, PageID.2704-05 (Shatina Grady Dep.) (testifying that it was deleted).  Neither alleged video has been produced in this case.  Nonetheless, they stated at the time that they were filming and no witness has disputed that their phones were out or that they were apparently filming.

Buffa, who is speaking with the occupants of the house.  Cratsenburg

Bodycam at 42:00.  Pearson is stationed behind a red vehicle in the

house's driveway.  Pearson Bodycam at 42:00.  Seconds after the Gradys

arrive, Pearson and Cratsenburg tell the Gradys to back up.  This is the

first verbal contact between the officers and the Gradys.  ECF No. 69-2,

PageID.1688.[28]

> To summarize what comes next, Shatina Grady starts to speak to

the officers in response, and gradually becomes louder and starts to yell.

Daniel Grady occasionally speaks or yells, though most of the testimony

in their criminal trial proceedings focuses on Shatina's volume and

remarks.  Their exchange goes on for about three minutes, and the

court recounts that exchange as follows:[29]

---

[28] Cratsenburg Bodycam Transcript.

[29] The following transcription is a mix of sources, combined to provide a single streamlined account of the exchange.  A few notes are warranted.  First, the court reduces the back-and-forth to include only exchanges between the officers and the Gradys and omits other portions of the transcripts and audio.  The omissions primarily consist of back-and-forth between unidentified speakers, who are usually Deputy Buffa and individuals inside the house.  Buffa speaks with individuals in the house throughout this entire exchange while he attempted to gain permission to search the home for the unidentified shooter.  At times, and where potentially relevant, the court notes what is happening in that separate (though contemporaneous) conversation.  Where the same speaker has multiple lines in a row, the break generally indicates omitted crosstalk by other parties.  Second, the court sources this accounting from the transcription of Cratsenburg's body cam

DEP. PEARSON:  (calling across the yard to the Gradys) Stay back.  Stay back.

DEP. PEARSON:  Ma'am?

SGT. CRATSENBURG:  Back up.

MS. GRADY:  What?

DEP. PEARSON:  Back up.

MS. GRADY:  I'm far enough back.  I'm not on this property.

SGT. CRATSENBURG:  You need to back up now.

MS. GRADY:  I'm not on this property.

---

provided as an exhibit at ECF No. 69-2, the transcription of Pearson's body cam provided as an exhibit at ECF No. 69-3, and the two body cam videos themselves (ECF 69-4, 69-11, submitted as media files).  Quotations are taken specifically from ECF No. 69-2, PageID.1688-1700 and ECF No. 69-3, PageID.1761-72.  When placed in center block text, quotations are taken from these transcripts at the indicated page numbers, which accurately reflect the audio from the body cam videos. Headphones are recommended for audio clarity when viewing the media exhibits. The court's version of this exchange, provided here, combines the two transcriptions (at times, audio is inaudible in one or the other and thus both transcriptions are in part incomplete).  Because the version provided here combines two transcripts and two different bodycams from different locations, the exact order of phrases may not be completely accurate.  Often, that discrepancy represents speakers talking over each other and the difficulty of representing what sentence came first.  However, the particular order of each sentence when they overlap is not critical to understanding the conversation or the result of the analysis.  Third, at times the court substitutes its own transcription of the audio for the official transcription provided as exhibits.  Those edits are marked in square brackets.  Comments on audio quality or overlapping crosstalk are generally noted in parentheses.  Fourth, to provide a clear timeline and narrative, the court intersperses the transcript with events clear from the videos and other testimony about what it is occurring at that time.

SGT. CRATSENBURG:  It doesn't matter.  I'm telling you to back up.

MS. GRADY:  No, I'm telling you I'm going to videotape.

DEP. PEARSON:  Okay.  You can do that from a distance. (overlapping)

SGT. CRATSENBURG:  You can videotape –

MS. GRADY:  It's my right.

SGT. CRATSENBURG:  You can videotape, but back up.

MS. GRADY:  It's my right.

SGT. CRATSENBURG:  Back up.

MS. GRADY:  It's my right.  It's my right.  I'm right here (INAUDIBLE).

SGT. CRATSENBURG:  If you don't back up –

MS. GRADY:  You got the whole yard.

SGT. CRATSENBURG:  It doesn't matter.

MS. GRADY:  You got the whole yard. (overlapping)

MS. GRADY:  Do what you gotta do.

SGT. CRATSENBURG:  Back up.

SGT. CRATSENBURG:  Next house down, and you'll be good.  Back up.

MR. GRADY:  We already did.

MS. GRADY:  Be quiet.

One note: although Daniel Grady says "we already did," no visible difference exists between the Gradys' position at the beginning of the conversation and this point.  *Compare* Cratsenburg Bodycam at 42:17 (around the beginning of the conversation, once Mr. Grady moves to join his wife in the bottom left of the screen), *with id.* at 42:47 (the approximate time that Daniel Grady says "We already did [back up.]").  Given the video and the Gradys' own testimony, there is no genuine dispute of fact that the Gradys did not comply with the order to back up.  ECF No. 69-10, PageID.2915 (Q: "And then you did not comply with their order?"  Daniel Grady: "Correct");[30] ECF No. 69-9, PageID.2698 (Q: "[T]hey're giving you an order to back up and you're saying not moving, right?"  Shatina Grady: "I don't think I said that, but I don't know. I didn't -- I did not move, though.").[31]

> SGT. CRATSENBURG:  If you don't back up, when we're done here, you're going to get arrested.

---

[30] Daniel Grady Dep. at 89.

[31] Shatina Grady Dep. at 115.

MS. GRADY:  Okay, whatever.

SGT. CRATSENBURG:  Now, back up.

MS. GRADY:  Whatever.  And I'll sue your ass in federal court.

SGT. CRATSENBURG:  Okay.  Back up. (overlapping)

MS. GRADY:  I'll see your ass in federal court.

SGT. CRATSENBURG:  I'm telling you to back up.

MS. GRADY:  I'll sue your ass --- where's ---

MS. GRADY:  Produce your warrant.

DEP. PEARSON:  Back up.

MS. GRADY:  Produce your warrant.  Produce your warrant.

SGT. CRATSENBURG:  We don't need a warrant.  Now, back up.[32]

MS. GRADY:  Who's got the warrant?  I want to see it.  It has – I need a warrant (INAUDIBLE) (overlapping)

MR. GRADY:  Who's got a warrant?

---

[32] Again, this discussion arises from the need for a warrant *or* the occupant's permission to enter and conduct a search.  *See* note 9.

> MS. GRADY:  (yelling now) Where is the warrant?  Produce a warrant.

In the conversation at the window, a person inside the house says, "We can't hear you" to Buffa, who repeats his comment, and their conversation continues.  Other than this one instance, no interruption happens between Buffa and the people inside the house.[33]  Buffa can be seen speaking about a foot away from the window throughout his conversation with the occupants.  Shatina Grady continues speaking/yelling in the background.

> MS. GRADY:  Where is the supervisor?

> MS. GRADY:  Where is the supervisor?

> MS. GRADY:  Where is the supervisor?

> MS. GRADY:  Where is the supervisor here on the scene?

> SGT. CRATSENBURG:  I'm right here.

> MR. GRADY:  Then, where's your warrant?

> MS. GRADY:  Then, where's the warrant?

---

[33] Where the transcriptions indicate there is inaudible crosstalk, it indicates that the speech is indistinguishable to a reviewer of the bodycam footage.  The video itself shows no interruption, other than this one, to the conversation occurring at that time between Buffa and the occupants of the house.  *See, e.g.*, Cratsenburg Bodycam at 43:23.

SGT. CRATSENBURG:  We don't need a warrant.

MR. GRADY:  You do need a warrant.

MS. GRADY:  Produce it.  You do, so.

MR. GRADY:  You do need a warrant.

MS. GRADY:  The constitution that you all swore an oath to says that you have to produce a valid warrant.

MS. GRADY:  You have to know what you are searching –

DEP. PEARSON:  Ma'am, shut up.

MS. GRADY:  -- and exactly where you are searching it.  So, where is the warrant?

At this time, someone inside the house says, "I'm not letting you touch my house if you don't have a warrant."  ECF No. 69-2, PageID.1693.  Up until this point, the conversation between Buffa and people inside the house had been about a) whether Buffa could bring another officer into the house with him (the speaker had granted permission for Buffa alone to come inside), and b) the speaker(s) discussing their concern for the safety of children inside the house and asking if they could be allowed outside first.  *See id.* at 1686-87, 1691-92.

MS. GRADY:  Where is the warrant?

MS. GRADY:  You're violating [violation] their constitutional rights if you don't have a warrant.

MS. GRADY:  The [Your] warrant has to be signed by a judge.

MS. GRADY:  The warrant has to specify – who you need to see i[n] the warrant.

MS. GRADY:  The warrant has to specify what places you are searching in the warrant.

MR. GRADY:  [With an affidavit.]

MS. GRADY:  (crosstalk) Produce a warrant.

MR. GRADY:  [With an affidavit.]

MS. GRADY:  You swore an oath to the constitution of [for] the United States of America.

MS. GRADY:  And you're breaking that oath with what you're doing.

MS. GRADY:  [You ain't got nothing else to say?]

MR. GRADY:  (crosstalk) Let it be known -- Let it be known these Washtenaw County Sheriff's Department does not have a warrant.

MS. GRADY:  And we'll be (INAUDIBLE) –

MS. GRADY:  -- and will believe (INAUDIBLE).

MR. GRADY:  What's today's date?

21

> MS. GRADY:  Today is May 20 –
>
> MS. GRADY:  What's the date here?
>
> DEP. PEARSON:  The 26th.
>
> MS. GRADY:  Okay.
>
> MR: GRADY: (crosstalk) May 26th.
>
> MS. GRADY: (crosstalk) I'm glad you know, because tomorrow, your ass will be (INAUDIBLE).

Buffa leaves the front of the house around this time, and walks up to Cratsenburg; his efforts to get permission to enter had stalled.

Cratsenburg Bodycam at 44:50.

> MR. GRADY:  The Washtenaw County Sheriff's Department does not have a warrant and trying to enter the house.
>
> SGT. CRATSENBURG:  I'm going to -- Let me go make a phone call.  Can you watch these –

Buffa tells Cratsenburg: "She [the occupant of the house] was going to let me come in there alone, but I ain't going in there alone."

ECF No. 69-2, PageID.1696-97 (Cratsenburg Bodycam Transcript).

Cratsenburg agrees that he won't go in alone, if at all.  *Id.*

> MS. GRADY:  You gotta have a warrant, buddy. I know if you're the supervisor, you already know that.  You have to produce a warrant.

Changing his mind, Buffa decides to try one more time: "Okay. Let me just -- let me make contact with her one more time.  Is she still at the window?  Is it still open?"  ECF No. 69-2, PageID.1697.

> MS. GRADY:  I need some names and some badge numbers, is what I need.
>
> MS. GRADY:  We got weapons drawn behind the truck.

Buffa again meets with the woman at the window and then points to Cratsenburg and a female deputy, and asks if the three of them can come in.  Cratsenburg Bodycam at 45:32.

Someone in the house tells Buffa, "I'm not letting you in, unless y'all got a warrant."   Buffa says, "Okay.  We're going to get one and it's going to be nasty."  The speaker replies, "Okay.  Go get a warrant, and then y'all can come in."  ECF No. 69-2, PageID.1698.  Buffa leaves the window.  Cratsenburg Bodycam at 45:40.

> SGT. CRATSENBURG:  [referring to the Gradys] Let's go deal with them.  She's going.
>
> DEP. PEARSON:  All right.

According to Pearson, "it was at that point becoming more of a distraction and an officer safety issue because the deputies up along in

the house were having a hard time hearing.  We were having a hard time hearing what they were talking about.  And we're also now having to divert our attention to make sure that these people didn't walk up into the perimeter further."  ECF No. 69-5, PageID.2031.[34]  As to why only the Gradys were arrested while other spectators were not, he says that "nobody [else] came close to our perimeter and entered in and started yelling, so they weren't interfering with our investigation."  *Id.* at PageID.2106.  In addressing the same issue in later testimony, Cratsenburg focused on Shatina Grady's actions; "[a]ttention was being diverted from the house to Ms. Grady El, and we needed to be focused on the house and not outside interference."  ECF No. 69-6, PageID.2288.[35]

At the time, what Cratsenburg said over radio was: "They're not allowing us entry in the house.  We're gonna lock it down for now."

Cratsenburg and Pearson leave their positions by the house to prepare to arrest the Gradys.

---

[34] Trial Tr. Vol. I at 225 (Pearson testimony).

[35] Trial Tr. Vol. II at 99 (Cratsenburg testimony).

### C.  Defendants Cratsenburg and Pearson arrest the Gradys

The two officers leave their positions by the house and walk around "from where [they] were standing by the side doors and the cars."

> [W]e went -- it would have been south around where Deputy Corona and I believe it was Deputy Houk at the time were at across the street with their long -- long gun behind them so we weren't in crossfire, and we were out of the – that immediate area instead of just walking in front of the door and around to that corner where the Grady Els were at.

ECF No. 69-13, PageID.3092.[36]

This walk out of the driveway, across the street, behind the vehicles, and back to the opposite corner of the lot is reflected in the body cam footage.  Pearson Bodycam at 46:04-46:30.  As they approach, Shatina Grady can be heard speaking (the exact sentence is not caught by the audio) as the officers approach.

> MS. GRADY:  (INAUDIBLE) trust you know that I (INAUDIBLE).

---

[36] Preliminary Exam Vol. II at 87 (Cratsenburg testimony).

MS. GRADY:  When you (INAUDIBLE) over there (INAUDIBLE) day in and day out by you (INAUDIBLE) policy enforcer.

Pearson and Cratsenburg come within a few feet of the Gradys at the fence line.  Cratsenburg Bodycam at 46:30.

SGT. CRATSENBURG:  Put your hands behind your back.  You're under arrest.

MS. GRADY:  No, no.

MR. GRADY:  For what?

SGT. CRATSENBURG:  Put your hands behind your back.

MS. GRADY:  No, no, no, no.

MR. GRADY:  Where's your warrant?

MS. GRADY:  No.

SGT. CRATSENBURG:  Interfering –

MS. GRADY:  No.

Shatina Grady puts one hand behind her back but keeps her phone raised in the other hand.  Cratsenburg Bodycam at 46:36.

SGT. CRATSENBURG:  Back up.

MS. GRADY:  I'm not -- no, don't touch me.

MR. GRADY:  Where's your warrant?

Daniel Grady steps in front of Shatina Grady, placing himself in between her and Cratsenburg.  Cratsenburg Bodycam at 46:37.

> MS. GRADY:  Don't touch me.

> MR. GRADY:  Where's your warrant?

Cratsenburg's arm moves forward, and both Gradys back up.  It's not clear whether Cratsenburg was attempting to grab Daniel Grady to arrest him or whether he was making some other movement with his arm.  Cratsenburg Bodycam at 46:38.

> MS. GRADY:  Don't fucking touch me.

Cratsenburg grabs Daniel Grady's right forearm in an attempt to begin his arrest.  Cratsenburg Bodycam at 46:40.  Pearson moves to arrest Shatina Grady, who is standing behind Daniel.  *Id.*; Pearson Bodycam at 46:38-40.

At this point, it is useful to track the arrests separately.

> i.     *Pearson and Shatina Grady*

Pearson's testimony picks up the narrative on Shatina's arrest: "As I walked over to Mrs. Grady, I grabbed both of her wrists so that I could put her in handcuffs.  She began to pull away from me."  ECF No.

69-5, PageID.2035.[37]  "I turned her around, still holding onto her wrist. She began to pull away."  *Id.* at PageID.2036.  "So, I picked her up and carried her over to the fence in the front yard there, so that way she couldn't run away from me while I tried to apply handcuffs."  *Id.*

At this point, Pearson's bodycam footage becomes obscured because Pearson's camera is on the front of his chest, which is now pressed against (or near) Shatina Grady's back.  Pearson Bodycam at 46:39-48; ECF No. 69-5, PageID.2046.[38]  Brief glimpses and audio show a struggle against the fence, but it is not obvious exactly what is happening.  *E.g.*, Pearson Bodycam at 46:52.  Relevant testimony mostly fills in the gaps left by the video.

Pearson says, "As I reach for my handcuffs, I still had ahold of her left wrist with my left arm, and I felt her bite down onto my left forearm."  ECF No. 69-5, PageID.2036.[39]  At that point, "I struck her in the back of the head three times with a closed fist."  *Id.*  "[D]uring this time, I was also telling her to stop biting me."  *Id.* at PageID.2037.

---

[37] Trial Tr. Vol. I at 230 (Pearson testimony).

[38] Trial Tr. Vol. I at 240 (Pearson testimony).

[39] Trial Tr. Vol. I at 230 (Pearson testimony).

After the third strike, Grady then released her bite on his arm.  "I pulled my arm back and stepped back.  She turned around and faced towards me, and then began to swing at my head and claw at the back of my head.  I grabbed her by the outside of her shoulders and turned around and took her to the ground at that point."  *Id.*; Pearson Bodycam at 46:57.  "She landed on her back.  I grabbed onto her arms and turned her onto her chest."  ECF No. 69-5, PageID.2037.[40]

"Once I turned her onto her chest, she put her arms underneath her chest between her and the ground.  And then, as I went to reach under to pull her arms out behind her back, she tried to or did bite my right forearm as well."  *Id.* at PageID.2037-38.  Pearson then told a nearby officer that she is biting him and that he needed help.  Pearson Bodycam at 47:13.  He then warned Grady that if she didn't stop she would get tased.  *Id.* at 47:21.  "Officer Gerwig from YPB [Ypsilanti Police] was standing nearby. I advised him that she tried to bite me again and asked him to come over and assist me.  He came over and

---

[40] There are various references throughout the transcripts to a Facebook Live video depicting some portion of this event and which was shown to the jury at trial. *E.g.*, ECF No. 69-5, PageID.1982, Trial Tr. Vol. I at 176 (opening statements). However, that video was not attached as an exhibit to any party's briefing on this motion and was therefore not available or considered by the court.

was able to control her right arm while I controlled her left arm.  And at that point, we were able to put her in handcuffs."  ECF No. 69-5, PageID.2039; Pearson Bodycam at 47:34.  A bite mark is visible on Pearson's left forearm from 47:28-38 on his body cam.

From 46:39, when Pearson moves to grab Grady's arm, to when Grady is shown lying facedown on the ground with her hands behind her back at 47:30, about 50 seconds passed.

At 47:54 on Pearson's bodycam footage, Grady says she can't breathe.  She is laying facedown and the officers are not visibly putting any weight on her other than an arm each holding her arms in place.  She again says, "Excuse me I can't breathe."  Pearson Bodycam at 47:59.  Pearson responds "Cool.  Cool story.  Hey Sarge (unclear).  She bit me and I'm bleeding." *Id.* at 47:59-48:05.  The two officers bring her to her feet and walk her towards the police vehicle for transport.  Pearson Bodycam at 48:24-48:44.[41]

---

[41] An explanation is warranted for the video; although not relevant to this motion, at this point Pearson takes off running because someone reports seeing a suspect matching the description of the shooter.  ECF No. 69-6, PageID.2296-97, Trial Tr. Vol. II at 107-08 (Cratsenburg testimony).  Cratsenburg ends up taking Grady the rest of the way to the vehicle.  Cratsenburg Bodycam at 49:45-50:30.

Grady's testimony at her deposition regarding this portion of the incident was largely that she could not recall anything after Pearson grabbed her.  ECF No. 69-9, PageID.2704-06 ("I think I started checking my video and the next thing I know somebody's grabbing me . . . I can't say that I recall what happened after he grabbed me, to be honest.").[42] This includes whether she bit Pearson: "I don't deny it.  If they -- if they said that's what happened, I don't recall it."  *Id.* at PageID.2709.[43]  She then resisted being placed in the police vehicle, kicking at the car. Cratsenburg Bodycam at 50:50.  Once put inside the police vehicle for transport after her arrest, she told an officer, "Bitch, you want to get bit too?"  Vehicle Cam at 04:52:33-36.[44]  She can be seen and heard kicking at the interior of the vehicle for some moments after.  *See* Vehicle Cam at 04:53:00-04:54:08 (the video is blurred but kicking is clear around 04:54:00).

---

[42] Shatina Grady Dep. at 121-23.

[43] Shatina Grady Dep. at 126.

[44] Shatina Grady testified that she does not remember saying that.  ECF No. 69-9, PageID.2750, Shatina Grady Dep. at 167.

Grady alleges that she sustained scratches, a "busted lip," and a "couple knots" on her head that she attributes to being struck by Pearson.  ECF No. 69-9, PageID.2637, 2642.[45]  She did not seek medical treatment for the scratches or lip.  *Id.* at PageID.2637.  She alleges that she did seek medical treatment for the knots on her head, but cannot recall where.  *Id.* at PageID.2638.  She was not diagnosed with a TBI or concussion.  *Id.* at PageID.2639.

### ii.    *Cratsenburg and Daniel Grady*

Daniel's arrest (happening simultaneously, and sometimes right next to Shatina's arrest) takes a different form.  The court describes the arrests separately in an effort to more clearly address each plaintiff's arguments and individually alleged constitutional violations.  The relevant time that Cratsenburg starts to arrest Daniel Grady is 46:39 on Cratsenburg's bodycam, at the same time Pearson moves to arrest Shatina Grady.

> SGT. CRATSENBURG:  You're under arrest.  Put your hands behind your back.
>
> MR. GRADY:  No, I'm not under arrest.  What did I do?

---

[45] Shatina Grady Dep. at 54, 59.

SGT. CRATSENBURG: Put your hands behind your back.

MR. GRADY: I'm not -- for what?

SGT. CRATSENBURG: Let's get –

(Unintelligible background yelling.)

While Cratsenburg struggles with or holds Daniel Grady's forearm, and speaks with him in a tense but relatively calm conversation, Pearson and Shatina Grady begin struggling. Yelling from spectators and perhaps Shatina Grady is audible.

MR. GRADY: What am I under arrest for?

SGT. CRATSENBURG: Interfering in an investigation.

MR. GRADY: How were we interfering?

SGT. CRATSENBURG: We're trying to work a shooting scene.

MR. GRADY: We're staying.

SGT. CRATSENBURG: And you're fucking right up on us.

(Unintelligible background screaming.)

The volume of the background screaming changes – likely in reaction to Pearson and Shatina Grady's struggle happening feet away.

When Cratsenburg completes the transcribed sentence above, his struggle (or hold) on Daniel Grady's forearm changes from a hold to an increase of force.  Cratsenburg Bodycam at 46:51.  It is not clear exactly what is happening, but some sort of struggle is visible for the next few seconds.  *Id.*

> SGT. CRATSENBURG:  Back up.
>
> (Unintelligible background screaming.)

Cratsenburg says that Daniel Grady was "kind of . . . pushing, because he was trying to get to his wife."  ECF No. 69-6, PageID.2292;[46] *see* Cratsenburg Bodycam at 46:51-59.

> SGT. CRATSENBURG:  Let go or you're going to get tasered.

Cratsenburg: "[T]hen, we pushed him, Mr. Grady El, off.  And then, Deputy Houk pushed him further back, and then I end up tasing him."  ECF No. 69-6, PageID.2292.[47]  Cratsenburg's body cam confirms his account, but it shows that immediately after he says "Let go or you're going to get tasered," Grady is either pushed off or relinquishes

---

[46] Trial Tr. Vol II at 103 (Cratsenburg testimony).

[47] Trial Tr. Vol II at 103 (Cratsenburg testimony).

his grip.  Another officer steps in between Grady and Cratsenburg and apparently pushes Grady backward again.  Cratsenburg Bodycam at 46:58-47:00.  The other officer comes back into view at 47:02, and appears to interact with Grady once more.  *Id.* at 47:03.  Cratsenburg deploys his taser on Grady at 47:04-05.

> (Unintelligible background screaming.)
>
> SGT. CRATSENBURG:  Back up.  Back up.
> (INAUDIBLE) taser, taser, taser.

From the start of the arrest at around 46:39 to the use of the taser at about 47:04, about 25 seconds passed.  From the time Grady stepped back or was pushed back to Cratsenburg's use of the taser, less than four seconds passed.  Daniel Grady's deposition testimony does not contain much of his version of events, other than that he does not recall some relevant events that he was asked about and does not recall anything after he was tasered.  ECF No. 69-10, PageID.2917-18, ECF No. 69-10, PageID.2942.[48]

---

[48] Daniel Grady Dep. at 91-92, 116.

Officers then placed Grady in handcuffs.  ECF No. 69-6, PageID.2295.[49]  Grady sustained bruises, scrapes, and cuts (ECF No. 69-10, PageID.2927), which later healed.  He did not seek medical treatment after this event.  ECF No. 69-10, PageID.2850.[50]

Both Gradys were taken to Washtenaw County Jail and have alleged emotional damages from their arrests.  ECF No. 69-10, PageID.2928, 2943; ECF No. 69-9, PageID.2759.

## III.  STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The standard for

---

[49] Trial Tr. Vol. II at 106 (Cratsenburg testimony).

[50] Daniel Grady Dep. at 24.

determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the record contains "a videotape capturing the events in question," the court may not adopt a "version of the facts for purposes of ruling on a motion for summary judgment" that "blatantly contradict[s]" the asserted version of events such that "no reasonable jury could believe it." *Raimey v. City of Niles, Ohio*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  And the court must "nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff.'" *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).  To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 251.

In the use-of-force context, "once the relevant set of facts is determined and all reasonable inferences are drawn in favor of the plaintiffs, to the extent supported by the record, the question of whether

the [officers'] actions were objectively unreasonable is 'a pure question of law.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. at 381 n.8; and citing *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008)). But "if there is some evidence – more than a mere scintilla of evidence – that [the plaintiff], through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause to believe that he posed a serious threat of harm, a genuine fact dispute is created." *Chappell*, 585 F.3d at 909 (emphasis removed).

## IV.  ANALYSIS

Plaintiffs bring seven counts against Defendants in their complaint. Plaintiffs first bring several claims under 42 U.S.C. § 1983 alleging violations of the U.S. constitution, and then bring various related state law claims. In the motions and responses, the arguments are organized somewhat differently by the parties. For the sake of efficiency, the court first addresses a single defendant (Buffa) on his own, and then addresses the other counts for the remaining defendants, Pearson and Cratsenburg.

### A.    Defendant Buffa – Failure to Intervene

First, one issue can be considered up front.  Defendants argue that Deputy Buffa was not involved with either plaintiff's arrest.  During the relevant period at issue in this case, Buffa was speaking with the homeowner to try and get consent to enter and search the home for the alleged shooter, with his back to the incident.  ECF No. 59, PageID.1654; *see, e.g.*, ECF No. 69-6, PageID.2237, 2288 (testimony to that effect).  The video confirms that Buffa never spoke with the Plaintiffs, much less approached them.  *See also* ECF No. 69-5, PageID.1997.[51]  Nor was Buffa standing close by as the arrests occurred.  Plaintiffs' counsel conceded at oral argument that upon review of the record, Defendant Buffa was not involved in any alleged unconstitutional action and may be dismissed from this case.

Considering Plaintiffs' representation conceding the extent of Buffa's liability, the facts presented by Defendants supporting their motion to award summary judgment to Buffa, and pursuant to Rules 21 and 41 of the Federal Rules of Civil Procedure, the court **GRANTS** summary judgment as to Defendant Buffa and **DISMISSES** Defendant

---

[51] Trial Tr. Vol. I at 191 (Buffa testimony).

Buffa from the action as to all counts.  The court's remaining analysis

relates only to Defendants Cratsenburg and Pearson.

### B.    Claims under § 1983

To state a claim under § 1983, a plaintiff must establish the

deprivation of a right secured by the Constitution or laws of the United

States caused by a person acting under color of state law.  *Sigley v. City

of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).  However, the

doctrine of qualified immunity protects government officials from

liability for civil damages "insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982).  Courts undertake a two-pronged inquiry to determine

an officer's entitlement to qualified immunity in the excessive force

context, examining both: "(1) whether the officer violated the plaintiff's

constitutional rights under the Fourth Amendment; and (2) whether

that constitutional right was clearly established at the time of the

incident."  *Estate of Hill ex rel. Hill v. Miracle*, 853 F.3d 306, 312 (6th

Cir. 2017) (citation omitted).  The two prongs can be addressed in any

order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Qualified

immunity shields an officer's actions if either inquiry is answered in the negative. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

Although Plaintiffs bear the burden of demonstrating that Defendants are not entitled to qualified immunity, the court views all facts in the light most favorable to the Gradys. *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015) (citation omitted).

Plaintiff alleges violations of the First Amendment for arresting them in retaliation of their speech, as well as the Fourth and Fourteenth Amendments to the US Constitution. The latter set of violations are alleged as follows:

> Plaintiffs' constitutionally protected rights that Defendant deputies and officer violated include the following:
>
> > a. the right to liberty protected in the Due Process Clause of the Fourteenth Amendment, which includes personal safety and freedom from captivity;
> >
> > b. the right to fair and equal treatment guaranteed and protected by the Equal Protection Clause of the Fourteenth Amendment;
> >
> > c. the right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.

> Defendant deputies and officer, acting under color
> of state law, arbitrarily took Plaintiffs into
> physical police custody, by violent and excessive
> force, without probable cause.

FAC, ECF No. 46, PageID.459.

They also alleged violations of the Eighth Amendment in their amended complaint.  ECF No. 46, PageID.460 (Count III).

The court, for clarity, separates these into six separate constitutional claims: First Amendment retaliation (Count I), Fourth Amendment right to be free from unlawful arrest, Fourth Amendment right to be free from excessive force, Fourteenth Amendment equal protection, Fourteenth Amendment due process (all contained in Count II), and Eighth Amendment (Count III).  *See* First Amended Complaint, ECF No. 46, PageID.457; ECF No. 46, PageID.459; *see also* Defs' Motion for Summary Judgment, ECF No. 69, PageID.1641 (reading Plaintiffs' claims under Count II in this way).  Because the presence or absence of probable cause is central to the parties' arguments and several of Plaintiffs' claims, the court first addresses the Fourth Amendment unlawful arrest claim, then follows with the remaining constitutional claims.

> *i.*     *Fourth Amendment Violation (Unreasonable Search*
>         *and Seizure) (Count II)*

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  To state a Fourth Amendment false arrest claim, a plaintiff must "prove that the arresting officer lacked probable cause to arrest the plaintiff." *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014).

Under Mich. Comp. Laws § 750.81d, it is a felony to assault, batter, wound, resist, obstruct, oppose, or endanger a police officer in the performance of their duties.  To "obstruct" includes the use of physical interference or force, or a knowing failure to comply with a lawful command.  *Id.* at (7)(a).  The two forms of obstruction are independent and separable; a person can violate the obstruction statute by failing to comply with an officer's lawful command, whether or not they physically interfere with police.  *See People v. Moreno*, 491 Mich. 38, 67 (2012); *United States v. Mosley*, 575 F.3d 603, 605 (6th Cir. 2009). That the command be lawful, however, is critical to the analysis; if a person is violating the statute only by their failure to comply, they

retain a common-law right to resist an unlawful arrest.  *See Moreno*, 491 Mich. at 47 ("one may use such reasonable force as is necessary to prevent an illegal attachment and to resist an illegal arrest").

Plaintiffs have asserted, both at their criminal trial and in this subsequent § 1983 action, that the command for them to back up was unlawful.  Much rides on this claim; if the command for them to "back up" was lawful, then their failure to comply with that command gave the police probable cause to arrest them.

A note is warranted here, implicitly recognized by the parties' focus only on Plaintiffs' alleged failure to comply: because to "resist" a police officer or an arrest is an independent violation of § 750.81d, the Gradys' resistance to their arrests could be seen to create probable cause for a valid arrest under the statute here.  But the question of probable cause in this case must rest instead on the threshold question of whether the officers could arrest the Gradys *in the first place* for obstruction by failure to comply.  An officer cannot create probable cause for resisting arrest under § 750.81d by giving an unlawful order and then moving to arrest someone for failing to comply with that order – and then somehow transform an unlawful arrest into a lawful one just

because the person resists.  To hold otherwise would be circular and would undermine *Moreno*'s holding preserving the right to resist an unlawful arrest in Michigan.[52]  *See Bourgeois v. Strawn*, 452 F. Supp. 2d 696, 710 (E.D. Mich. 2006) (although pre-*Moreno*, noting that the "argument[] that police can manufacture grounds to arrest a person innocent of wrongdoing simple by telling him to leave his own home without any lawful authority to do so and then arresting him for violating that directive, is a disturbing proposition"); *Hulbert v. Pope*, 535 F. Supp. 3d 431, 453 (D. Md. 2021) (Maryland) ("[W]here the order is neither reasonable nor lawful, the failure to obey a lawful order statute cannot serve as the basis for probable cause.") (internal citation and marks omitted), *overruled on other grounds in Hulbert v. Pope*, 70 F.4th 726, 729 (4th Cir. 2023); *Storey v. Taylor*, 696 F.3d 987, 994 (10th Cir. 2012) (New Mexico) (where plaintiff refused to allow police entry to his home and police lacked other grounds to arrest, plaintiff's "refusal to

---

[52] The same applies to the Gradys' failure to comply with the order to put their hands behind their backs when police moved to arrest them or any other orders to comply with their arrests.  *See* Defs' Motion for Summary Judgment, ECF No. 69, PageID.1651, 1653, 1638.  Probable cause for a predicate offense must exist to begin an arrest in the first place.

obey could not justify his arrest" under the resisting and obstructing statute).

Defendants make three arguments on the probable cause point: 1) the state court's decision to bind over the case for trial conclusively established that there was probable cause, and that decision precludes this court from even re-examining the issue,[53] 2) there was probable cause to arrest the Gradys under the obstruction statute regardless, and 3) even if either of the first points were not true, that qualified immunity bars the Gradys' claims.  The court addresses each argument in turn.

a)    Issue Preclusion

This court must "give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."  *Haring v. Prosise*, 462 U.S. 306, 313 (1983) (quoting *Allen v. McCurry*, 449 U.S. 90, 96 (1980)).  Consequently, the threshold

---

[53] Defendants also argue that the Attorney General's review of the case and decision to prosecute the Gradys is weighty evidence in this case, both as a matter of probable cause and of qualified immunity.  *See* ECF No. 69, PageID.1633.  The court disagrees that this is particularly probative; their criminal case involved many charges, including for the Gradys' resistance to arrest and Shatina Grady's alleged damage to a police vehicle.  Their § 1983 case rests on narrower grounds for probable cause and involves different legal determinations.

question is whether rules of collateral estoppel applied in Michigan state courts would foreclose a litigant in a later-filed § 1983 civil action from challenging a finding of probable cause previously made in a preliminary hearing during a criminal prosecution. The answer is complicated, but the court concludes from Sixth Circuit precedent and prudential concerns that issue preclusion does not prevent Plaintiffs from arguing a lack of probable cause in this case.

When collateral estoppel "is asserted defensively to prevent a party from relitigating an issue that such party has already had a full and fair opportunity to litigate in a prior suit, mutuality is not required." *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 681 (2004). The party seeking to apply preclusive effect to a prior court determination must establish that:

1) there was a valid, final judgment in the first proceeding,
2) the same issue was actually litigated and necessarily determined in the first proceeding, and
3) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (citing *People v. Gates*, 434 Mich. 146 (Mich. 1990)).

In general, the Sixth Circuit has held that where "the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action." *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987) (applying Michigan law), *overruled on other grounds*, *Frantz v. Village of Bradford*, 245 F.3d 869 (6th Cir. 2001).  The Sixth Circuit has applied this structure to cases, like this one, where probable cause was at least ostensibly litigated in a preliminary exam in state court.  *See Autrey v. Stair*, 512 F. App'x 572, 573 (6th Cir. 2013).  Nonetheless, under this framework, when "a plaintiff in a § 1983 cause of action can point to instances where the consideration of falsehoods or the omission of material exculpatory evidence could have colored a state-court judge's probable-cause determination, there is no requirement that the initial finding be given preclusive effect in the federal-court action." *Autrey*, 512 F. App'x at 579 (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001)).  Relitigation is also permitted under the *Coogan* framework when a plaintiff can "differentiate the state-court probable-cause

49

determination from the probable-cause analysis in the federal cause of
action on grounds that additional considerations are at issue in this
litigation," or "if he can demonstrate that he did not have a 'full and fair
opportunity to litigate the [probable cause] issue in the earlier
proceeding.'" *Id.* at 581; *see, e.g.*, *Darrah*, 255 F.3d at 311 ("[W]e hold
that the state court's determination of probable cause at the
preliminary hearing is not identical to the issue Darrah argues today,
that being whether Officer Bragg made materially false statements to
the state judge that formed the basis of that court's probable cause
determination.")

As to why this is the case, the *Coogan* court explained that:

> [Not] every determination in a preliminary
> hearing should be given preclusive effect in a
> subsequent § 1983 action.  Some preliminary
> hearings are little more than formalities.  Also,
> even when an opportunity for full adversary
> proceedings is afforded, strategic concerns may
> counsel against engaging in such an exercise at
> the early stages of a criminal proceeding.
> However, where the state affords an opportunity
> for an accused to contest probable cause at a
> preliminary hearing and the accused does so, a
> finding of probable cause by the examining
> magistrate or state judge should foreclose
> relitigation of that finding in a subsequent § 1983
> action.

*Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987), *overruled on other grounds in Frantz v. Village of Bradford*, 245 F.3d 869 (6th Cir. 2001); *see Diamond v. Howd*, 288 F.3d 932, 936 (6th Cir. 2002) (citing *Coogan*, noting that "given that Diamond was not entitled to discovery before her state preliminary hearing, it is not at all clear that, even if she had participated, her preliminary hearing would support collateral estoppel"). Applying the *Coogan* standard, courts have split on factual grounds on whether to apply collateral estoppel. *Compare Lemon v. City of Detroit*, No. 19-cv-11343, 2021 U.S. Dist. LEXIS 18418, at *3 (E.D. Mich. Feb. 1, 2021) ("Lemon has failed to show either that Willhelm omitted evidence with a culpable state of mind or that the omitted evidence was material to the finding of probable cause."), *and Bridgewater v. Harris*, No. 16-14112, 2020 U.S. Dist. LEXIS 27775, at *25 (E.D. Mich. Feb. 19, 2020) (bind over in state court had "preclusive effect since Bridgewater does not 'point to instances where the consideration of falsehoods or the omission of material exculpatory evidence could have colored a state-court judge's decision.'") (citation omitted), *with, e.g.*, *Hanner v. Black*, No. 03-74675, 2005 U.S. Dist. LEXIS 29668, at *16 (E.D. Mich. Nov. 16, 2005) ("both plaintiffs

asserted that the police officers gave false statements at the
preliminary hearings in order to establish probable cause" and therefore
collateral estoppel did not bar claims), *Henry v. City of Eastpointe Police
Dep't*, No. 11-10192, 2013 U.S. Dist. LEXIS 49315, at *21 (E.D. Mich.
Apr. 5, 2013) ("A threadbare recitation of the facts does not constitute
evidence that an issue was "actually litigated.").

However, more recent Sixth Circuit decisions have cast
considerable doubt as to whether this doctrine of estoppel can properly
be applied *at all* to a § 1983 plaintiff who did not have the opportunity
to fully litigate whether police had probable cause to arrest them in
state court because they were later acquitted by a jury.  *See Bradley v.
Reno*, 749 F.3d 553, 558 (6th Cir. 2014) (criticizing *Coogan* and similar
cases because they do "not explain why courts should recognize a
§ 1983/probable cause exception to the norm that unappealable rulings
are not eligible for issue preclusion.");[54] *see also Hirmuz v. City of
Madison Heights*, 469 F. Supp. 2d 466, 479 (E.D. Mich. 2007) (where the
trial court determined as a preliminary matter that a statement was

---

[54] In *Coogan*, the plaintiff's criminal prosecution ended in dismissal on a
speedy trial violation.  *See Coogan* at 172.

voluntary but then submitted the case to a jury, the jury's acquittal prevented application of collateral estoppel regarding that statement in later civil action).  The *Bradley* court instead found it more persuasive that "when an acquittal prevents a criminal defendant from appealing a ruling, the ruling has no preclusive force."  *Id.* (citing *Jenkins v. City of New York*, 478 F.3d 76, 91-92 (2d Cir. 2007) (New York law) ("[T]he danger inherent in the doctrine of collateral estoppel—that an erroneous first decision on an issue will be perpetuated in subsequent litigation—is remedied by the requirement that the doctrine not be applied when there is no opportunity for appellate review. . . . This principle is of substantial import in the context of a criminal proceeding ultimately dismissed."); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1020-23 (7th Cir. 2006) (Illinois) ("[T]he unavailability of an appeal is determinative . . . Collateral estoppel therefore cannot bar relitigation of the voluntariness of [the plaintiff's] confession."); *Dixon v. Richer,* 922 F.2d 1456, 1459 (10th Cir. 1991) (Colorado) ("[The] requirements [of issue preclusion] have not been met. . . . [The plaintiffs] did not have an opportunity to appeal the court's ruling on their motion to suppress. Before a final judgment, such an interlocutory appeal would have been

improper, and after the judgment ([the plaintiffs] were acquitted), an appeal was rendered moot."); *Sena v. Commonwealth*, 417 Mass. 250, 629 N.E.2d 986, 992 (Mass. 1994) ("[T]here was no avenue for review of the criminal court ruling on the plaintiffs' motion to dismiss for lack of probable cause. . . . Thus, the issue of the existence of probable cause to support the plaintiffs' arrest is not precluded . . . .").

These out-of-circuit precedents notwithstanding, a second reason to consider caution in extending *Coogan*'s holding to cases where plaintiffs were ultimately acquitted is that doctrine's treatment even within the Sixth Circuit; the application of estoppel to acquitted plaintiffs has been questioned or is outright not applicable in other states in this circuit. *See Jones v. City of Elyria*, 947 F.3d 905, 915 (6th Cir. 2020) (Ohio law) ("unappealable state-court orders do not have preclusive effect on parties seeking to re-litigate an issue in a later case"); *see also Wiggins v. Metro. Gov't of Nashville & Davidson Cty.*, No. 16-5519, 2017 U.S. App. LEXIS 21913, at *6 (6th Cir. May 8, 2017) (Tennessee) (in a case where defendant was convicted by guilty plea, "the state trial court found that Wiggins's arrest was supported by probable cause, . . . and that the officers' conduct therefore did not

violate Wiggins's rights under the Fourth Amendment . . . . [h]owever, because an order denying a motion to suppress does not adjudicate all the claims, it [wa]s not a final judgment.") (internal quotation marks omitted); *White v. Wilson*, No. 1:18-cv-00093, 2019 U.S. Dist. LEXIS 154122, at *16 (M.D. Tenn. Sep. 10, 2019) (suggesting that collateral estoppel may not apply to a "defendant who has been granted judicial diversion in Tennessee [who] has no appeal as of right to the state court of appeals"); *Donovan v. Thames*, 105 F.3d 291, 298 (6th Cir. 1997) (Kentucky) (collateral estoppel applied because defendant "could have appealed his conviction," suggesting the result might differ if no appeal was available); *Walker v. City of Leb.*, No. 3:12-CV-855-H, 2013 U.S. Dist. LEXIS 166851, at *9 (W.D. Ky. Nov. 23, 2013) (dismissing plaintiff's claims of wrongful arrest where he had been convicted on collateral estoppel grounds, but noting plaintiff's pending criminal appeal and permitting plaintiff to refile if successful because "a reversal of his conviction [was] material" to the issues presented); *Lyvers v. Newkirk*, No. 1:15-CV-00096-GNS, 2017 U.S. Dist. LEXIS 201340, at *12 (W.D. Ky. Dec. 7, 2017) (A "preliminary hearing is held to determine whether there exists probable cause that a crime was

committed, not to determine whether the police had probable cause at the moment of the arrest.").  While the test for applying collateral estoppel is a matter of state law, the application of that test to § 1983 claims is a matter for federal courts.  The trend of federal courts considering the similar laws of other states in this circuit is suggestive of the doctrine's problematic application in cases of acquittal.

Even in cases only applying Michigan law, the Sixth Circuit has reached contrary conclusions.  *Autrey*, which is a nonbinding 2013 unpublished decision of the court of appeals, applied collateral estoppel against a Michigan plaintiff seeking to relitigate the probable cause determination who had been acquitted at trial, because the plaintiff was represented by competent counsel at his preliminary examination (and, in that panel's view, thus complied with *Coogan*'s test for a full and fair hearing).  *See Autrey*, 512 F. App'x at 582.  That unpublished decision is at odds with the published *Bradley* decision, which is also more recent and cast doubt on *Coogan* when it stated that "acquittal prevents a criminal defendant from appealing a ruling, the ruling has no preclusive force."  *Bradley v. Reno*, 749 F.3d 553, 558 (6th Cir. 2014). *Bradley* applies Ohio law, but to the extent that its holding would

56

extend to Michigan law as well, *see Bradley* at 558 (criticizing *Coogan*'s application to preliminary probable cause findings on substantive grounds regardless of the particular state's law), the results in unpublished Michigan district court decisions largely have not applied it. *See, e.g.*, *Cosgrove v. Pettigrew*, No. 21-cv-10379, 2022 U.S. Dist. LEXIS 194878, at *13-14 (E.D. Mich. Sep. 26, 2022) ("An arrest grounded in probable cause does not become invalid merely because the State chooses not to prosecute the individual or a jury opts for acquittal."); *Ratcliff v. City of Detroit*, No. 2:19-cv-13458, 2021 U.S. Dist. LEXIS 227516, at *8 (E.D. Mich. Nov. 29, 2021) (video of the incident was sufficiently exculpatory and not considered in state court proceedings and therefore collateral estoppel did not apply). The Sixth Circuit, however, very recently applied a *Bradley*-like standard to Michigan when it concluded, in a case applying Michigan law, that because a jury ultimately acquitted the plaintiff/defendant, he could not have appealed the state court's unfavorable interlocutory ruling that the officers had probable cause to arrest him, and therefore issue preclusion did not apply in his later § 1983 action. *See Koelzer v. Westrick*, No. 22-1835, 2024 U.S. App. LEXIS 11287, at *8 (6th Cir. May

7, 2024); *see also Blackwell v. Nocerini*, 123 F.4th 479, No. 24-1186, 2024 U.S. App. LEXIS 31785 (6th Cir. Dec. 16, 2024) (also Michigan) (not even addressing whether plaintiff would be collaterally estopped from relitigating probable cause where he was acquitted at a state court trial); *but see Harcz v. Boucher*, 763 F. App'x 536, 544 (6th Cir. 2019) (applying *Coogan* but reversing dismissal on the pleadings where plaintiff plausibly alleged that the probable cause determination relied on misleading testimony).  Thus even in Michigan, a more recent trend of the Sixth Circuit has disfavored the application of *Coogan*'s holding to cases where a plaintiff was acquitted at their criminal trial and that acquittal rendered the preliminary probable cause determination unappealable.

A third consideration counsels restraint from applying the collateral estoppel doctrine in cases of acquittal; "Michigan case law does not equate the probable cause to support an arrest with the probable cause to bind a defendant over for trial, which is conclusive on the issue." *Ratcliff v. City of Detroit*, No. 2:19-cv-13458, 2021 U.S. Dist. LEXIS 227516, at *7 n.2 (E.D. Mich. Nov. 29, 2021) (citing *People v. Cohen*, 294 Mich. App. 70, 74 (2011) (holding that probable cause to

58

support an arrest is not equivalent to probable cause to bind a defendant over for trial)); *see also Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975 (8th Cir. 1993) (North Dakota) (state court motion for dismissal for lack of probable cause clearly referred to whether there was sufficient evidence to go to the jury, not whether there was sufficient probable cause for arrest, and therefore the district court erred in applying collateral estoppel). Here, the trial court considered whether there was probable cause to bind over for alleged violations of § 750.81d for not only the Gradys' alleged failure to comply, but also the Gradys' alleged resistance to their arrests. But as explained above, the question for the purposes of a later civil suit for false arrest must necessarily focus on only the first question, which could yield a different answer.

In consideration of the above, the court finds that collateral estoppel does not bar Plaintiffs' litigation of probable cause. In so finding, the court follows the Sixth Circuit's holdings in *Bradley* and *Koelzer* and agrees with the problems posed by application of collateral estoppel to a claim where the plaintiff was acquitted and therefore had no opportunity to appeal the state court's preliminary probable cause

determination.  Therefore, there was never a "final judgment" under the collateral estoppel rule.  Further, in Michigan, the probable cause standard for arrest is not the same as the one for bind over, the probable cause standard was never reviewed at the arrest stage, and thus there was never a "full and fair" determination of that standard specifically.  Thus probable cause was not "necessarily determined in the first proceeding" and does not bind this court.

        b)      Probable Cause

The court must therefore consider whether there remains a dispute of material fact as to whether the police had probable cause to arrest the Gradys for obstruction (here: failure to comply with a lawful order, or obstruction via their yelling, primarily Shatina Grady's).

To determine whether an officer had probable cause for an arrest, a court should "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Maryland v. Pringle*, 540 U. S. 366, 371 (2003) (second quoting citation omitted)). Because probable cause "deals with probabilities and depends on the

totality of the circumstances," *Pringle*, 540 U. S., at 371, it is "a fluid

concept" that is "not readily, or even usefully, reduced to a neat set of

legal rules." *Illinois v. Gates*, 462 U. S. 213, 232 (1983).  It "requires

only a probability or substantial chance of criminal activity, not an

actual showing of such activity." *Id.*, at 243-244, n.13, (1983).  Probable

cause "is not a high bar," *Kaley v. United States*, 571 U. S. 320, 338

(2014), and requires only the "kind of 'fair probability' on which

'reasonable and prudent [people,] not legal technicians, act.'" *Florida v.*

*Harris*, 568 U.S. 237, 244 (2013) (quoting *Gates*, 462 U.S. at 231).

Whether probable cause exists depends upon the reasonable

conclusion to be drawn from the facts known to the arresting officer at

the time of the arrest.  *Pringle*, 540 U.S. at 371.  While the complaint in

this case raises questions about the motivations of the arresting

officers, the Supreme Court has held that the officers' statements and

subjective motive are irrelevant under Fourth Amendment analysis.

*Devenpeck v. Alford*, 543 U.S. 146, 154 (2004).

### 1.   Critical speech as obstruction

The first question is whether either Plaintiffs' speech – but

specifically Shatina Grady's – could have given rise to probable cause

for obstructing police in their duties.  Defendants have argued that this is one method by which there was probable cause that they violated § 750.81d, by "shout[ing] at the officers, diverting the officers' attention."  ECF No. 69, PageID.1645.  Some cases suggest this construction of § 750.81d is possible.  For example, in *King v. Ambs*, a Michigan police officer went to a house's front door to question the occupant about marijuana found in a parked vehicle.  519 F.3d 607 (6th Cir. 2008).  The officer began by asking them to step outside their house and speak with him.  A drunk neighbor standing close by (King) urged the suspect not to leave the house and advised him that he did not have to talk to the officer.  *Id.* at 609.  The police officer testified that King spoke over him.  King claimed that he was not speaking over the officer, and that he in no way physically or verbally interfered with the officer's attempt to speak with the suspect.  The officer then arrested King, and he was charged with opposing an officer in the performance of his duty.  The state court dismissed the criminal charges under the theory that the statute prohibited only "actual physical interference."  *Id.* at 610.  But in King's subsequent action under § 1983, the district court and the Sixth Circuit disagreed, holding that King's "verbal interference" with

the officer's investigation amounted to a "physical interruption of the questioning," which provided probable cause for his arrest.  The line drawing here seems to be one of volume, tone, tenor, and physical nearness – evaluating when speech becomes verbal conduct.  *See Patrizi v. Huff*, 821 F. Supp. 2d 926, 932-33 (N.D. Ohio 2011) ("[I]f a defendant's speech transforms into verbal conduct, then this *conduct* can constitutionally be criminalized.").  In *Patrizi*, an officer investigating a possible assault at a club began investigating and questioning a group of individuals.  A lawyer, Patrizi, joined the group and began asking questions like "is she in custody?"  *Id.* at 929.  As the encounter continued, Patrizi asked the officers more questions: "[D]o you consider my client a suspect?  Why are you questioning them?  What are they being charged with?"  *Id.*  The officers testified that they ordered her to leave; Patrizi disputed that testimony.  When she allegedly refused to leave, however, police arrested her.  In her subsequent § 1983 suit, the Ohio district court found that, under Ohio law, no probable cause existed to arrest the plaintiff for obstruction because she "did not conduct herself in a belligerent or argumentative manner[,]" "[n]or did she shout or refuse to desist in her course of

conduct[.]" *Id.* at 933.  Similarly, in another case under Ohio law, the

court of appeals considered a criminal appeal seeking to reinstate

charges under Cleveland's obstruction ordinance.  *See City of Cleveland*

*v. Kristoff*, 2002-Ohio-1265, 2002 WL 441584 (Ct. App. Mar. 21, 2002).

The defendant, Kristoff, "noticed his friend being questioned," and then

requested that the detectives provide identification, to which neither

detective responded.

> Kristoff repeatedly told his friend that he was not
> required to answer any questions until the
> detectives provided identification proving that
> they were, in fact, detectives.  In an attempt to
> dissuade Kristoff from interfering, the detectives
> warned Kristoff that he was hampering an official
> investigation.  Kristoff ignored the warnings and
> continued.

*Id.*

The court of appeals affirmed that the charge unconstitutionally

infringed on the defendant's First Amendment rights:

> Kristoff's comments may have disturbed the
> detectives insofar as their investigation was in
> abeyance while the detectives turned to Kristoff
> to warn him about interfering.  However, the City
> presented no evidence that Kristoff's encouraging
> statements advising his friend of his right to
> refrain from answering the detectives' questions
> were spoken so boisterously and in such a

64

> manner as to prevent the detectives from
> carrying out their duties.

*Id.*

Here, Shatina Grady told police (or shouted at them, depending on which statement): "You do need a warrant," "Produce a warrant," "Where is the supervisor," "I'll sue [you] in federal court," "You're violating their constitutional rights if you don't have a warrant," and more statements of that nature. Like the above cases, her statements are largely critical of police (or implicitly encourage a third party to (legally) not do what the police are asking them to do).

As the court has noted above, the video evidence shows only a single instance where Shatina Grady's yelling actually (and very briefly) interrupts the conversation happening between Buffa and the house's occupants. *See supra* note 33 and accompanying text. True, Cratsenburg and Pearson spent time telling her to "shut up," "back up" and otherwise responding to her. But analogizing to *City of Cleveland v. Kristoff*, a reasonable jury could easily conclude that her yelling *alone* was *not* physical obstruction in violation of Mich. Comp. L. § 750.81d because the video confirms that her yelling did not in fact prevent police from carrying out their duties and she never approached beyond the

corner of the property.  Cratsenburg and Pearson's duties included securing the scene, which presumably included the act of keeping out the Gradys, so any "distraction" by having to perform this duty is surely of low probative value.  That the house's occupants did eventually refuse entry to the police, possibly because Grady kept yelling that police needed a warrant, is also immaterial; like the friend being questioned in *Kristoff*, it was always their right to refuse entry and cannot constitute proof of obstruction (unlike the situation where a vehicle's occupant has no right to ignore an order to get out of their car or produce identification in a *Terry* stop, and the failure to do so can be obstruction).  *See People v. Kinsinger*, No. 364639, 2024 Mich. App. LEXIS 7292, at *1 (Ct. App. Sep. 19, 2024).

Still, under *King v. Ambs*' construction of § 750.81d, there arguably could have been probable cause to arrest Shatina Grady for the volume of her shouting, because perhaps an officer could have reasonably questioned whether her shouting physically interrupted their attempt to gain entry to the house by diverting their attention (even if it did not, in fact, amount to obstruction of the conversation). But differentiating criminality between and yelling criticism from a

distance and politely criticizing police in a measured tone is "slicing the baloney mighty thin[,]"[55] introduces a strange tone-policing into First Amendment analysis that does not belong,[56] and may not be a valid interpretation of Mich. Comp. L. § 750.81d under current case law. Since *King* (2008), the Michigan court of appeals has clarified that § 750.81d does not reach mere speech opposing police conduct: "state actors cannot under this statute arrest and convict persons for only utilizing constitutionally protected words in opposition to the actions of, for example, a police officer." *People v. Morris*, 314 Mich. App. 399, 411 (2016); *id.* at n.6 ("a 'knowing failure to comply with a lawful command' requires some physical refusal to comply with a command, as opposed to a mere verbal statement of disagreement"); *People v. White*, No. 362136, 2023 Mich. App. LEXIS 8752, at *8-9 (Ct. App. Nov. 30, 2023) ("the listed ways in which a defendant may resist or obstruct a person all have the common element of physical interference and are, therefore, not overbroad and do not only encompass constitutionally protected

---

[55] *Cf. Sessions v. Dimaya*, 584 U.S. 148, 161 (2018).

[56] *See, e.g.*, *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (noting that "the First Amendment protects even profanity-laden speech directed at police officers" and that "[p]olice officers reasonably may be expected to exercise a higher degree of restraint than the average citizen").

speech"). Physically obstructive conduct is still unprotected. For example, the Michigan court of appeals reversed a trial court's decision to quash an information based on a violation of § 750.81d where the defendant had verbally criticized the police while also physically interfering with their duties. *See People v. Miskovich*, No. 325727, 2016 Mich. App. LEXIS 1073 (Ct. App. May 26, 2016). There, the officer "testified that defendant was 'right in [his] face, yelling,'" and therefore his conduct "could reasonably be viewed as physically obstructive in nature." *Id.* at *5. Therefore, it was at least plausible that the defendant could be arrested and prosecuted for his conduct. "Had [the] defendant merely shouted his profanities towards Officer Williams from a reasonable distance," the court noted, "a different conclusion might be warranted. *Id.* at *8.

That line-drawing suggests that the Gradys, shouting from a distance, probably could not have been able to violate the statute via their speech at all. *See Miskovich*, 2016 Mich. App. LEXIS 1073, at *10 (comparing cases where plaintiffs merely shouted at police officers versus the situation presented in that case, where plaintiff stood "imposingly [] next to" the officer); *Houston v. Hill*, 482 U.S. 451, 462

68

(1987) (considering overbreadth of a statute that prohibited "speech that 'in any manner . . . interrupt[s]' an officer" and holding that "[t]he Constitution does not allow such speech to be made a crime."); *Jordan v. Adams Cty. Sheriff's Office*, 73 F.4th 1162, 1169 (10th Cir. 2023) ("the First Amendment does not protect only quiet and respectful behavior towards police; it protects loud criticism that may annoy or distract the officer"); *but see id.* ("if the act of criticizing itself is so loud that an officer is prevented from executing his or her duties, then the officer may restrict the speech based on this physical act, which does not rely on the content of the speech.").

Here, there is no dispute that the Gradys never advanced past their position at the corner of the property.  They never stood anywhere near an officer and there is no plausible argument that anything other than Shatina Gradys' speech "physically" interfered with police that night, at least prior to their arrests.  Plaintiffs only shouted their criticism from a distance, and clear lines can be drawn between this case and those where speakers get too close to police in performance of their duties.

The point is this: accepting that Shatina Grady's same exact speech, made from the same spot in a slightly lower tone of voice, would plainly *not* have fallen within a permissible application of the statute, could just the volume or frequency of her speech create probable cause to think that her speech was "physically" disruptive?  Other than the Defendants' short mention of this basis for probable cause, the parties do not spend much time on this point, and so the court will refrain from drawing any firm conclusions about the reach of the statute here. Suffice it to say that, even assuming that mere speech could at some point become physically obstructive, it would be arguable whether probable cause could have existed to believe that Shatina Grady's speech reached the level of physical obstruction in this case.

The above discussion makes very clear, however, that probable cause could not have existed under this theory for Daniel Grady, because there is no serious argument that any of the few statements he did make physically obstructed police in their duties, and like Shatina Grady, his filming from a distance of 20-30 feet could not plausibly pose a physical interference to the officers.  A different basis is needed to account for his arrest, and it's on that basis that Defendants primarily

argue that probable cause existed for both arrests.  *See* ECF No. 69, PageID.1645 (Defendants' motion).

2.     Failure to comply with a lawful order without reference to speech

The second question, whether the Gradys' failure to back up in response to officers' orders gave rise to probable cause under the statute, is also made difficult by the fact that they were engaged in speech.  *See Jordan v. Adams Cty. Sheriff's Office*, 73 F.4th 1162, 1169 (10th Cir. 2023) ("[S]ince the First Amendment protects the right to criticize police, then <u>a fortiori</u> it protects the right to remain in the area to be able to criticize the observable police conduct.") (emphasis in original).  Under Mich. Comp. L. § 750.81d, it is a felony to knowingly fail to comply with a lawful command.  No jury could conclude that the Gradys did not comply with the officers' orders to back up; they didn't.  *See supra* notes 30, 31 and accompanying text.  The issue comes down only to whether the police had the lawful authority to order the Gradys to "back up" from an active crime scene, when they already stood off the property, 20-30 feet away, on a public sidewalk, and when they were

also engaging in First Amendment activity by filming police.[57]  At

times, both the Plaintiffs and Defendants have put this issue in terms

of establishing a "perimeter" around the house and whether the Gradys

violated that perimeter.  *See* ECF No. 69, PageID.1645; ECF No. 75,

PageID.4104.  The parties disagree whether the officers could force

people to move outside of that perimeter, whether a perimeter was ever

established, what precisely establishes a perimeter, and if a perimeter

is not clearly established in a given area, what authority the police have

in that space.  *See id.*; *supra* notes 13-18 and accompanying text.

Few cases clearly lay out police authority to secure a perimeter,

and Defendants do not point the court to any statutory authority.  But

cases that do mention the issue appear to assume that police have that

power when they have legitimate concerns such as safety or a

reasonable need to allow police to complete their investigation.  *See*

*Wilkerson v. Warner*, 545 F. App'x 413, 428 (6th Cir. 2013) ("Officer

Warner had probable cause to arrest Wilkerson based on a reasonable

belief that she acted in violation of Mich. Comp. L. § 750.81d(1) due to

---

[57] See Section B.ii(a) (defining "protected conduct under the First
Amendment).

her failure to heed his commands intended to secure the scene for the EMS personnel."); *People v. Corr*, 287 Mich. App. 499, 505 (2010) (police's lawful duties in the course of an investigation include "maintaining the peace and controlling the scene"); *People v. Lacey*, No. 317964, 2015 Mich. App. LEXIS 491, at *3 (Ct. App. Mar. 10, 2015) (noting that "Detroit police officers established a perimeter"); *see also Baker v. City of McKinney*, 220 L.Ed.2d 240, 241 (U.S. 2024) ("police arrived soon after and set up a perimeter around Baker's home") (Texas) (statement of Sotomayor, J., joined by Gorsuch, J., respecting denial of certiorari); *Commonwealth v. Gray*, 465 Mass. 330, 344 (2013) (Massachusetts) ("police have authority to secure a dwelling from the outside"); *Woodward v. Gray*, 241 Ga. App. 847, 850 (2000) (Georgia), *disapproved on other grounds in Stryker v. State*, 297 Ga. App. 493, 495 n.1 (2009) ("Police can create a reasonable crime scene perimeter, put up a crime scene tape to avoid destruction or tampering with evidence, or exclude the public from a reasonable physical zone of an arrest within which there is a risk of physical contact between the officer, suspect, and public or a passing of weapons or evidence. However, a command to clear the general area entirely beyond the zone

of police operations constitutes an overly broad and unreasonable demand that exceeds reasonable law enforcement procedure and needs."). These cases all suggest that police were able to enforce a reasonable perimeter around the house when they were attempting to apprehend a shooting suspect.

However, where their stance at the edge of the perimeter was accompanied by First Amendment activity, it is incomplete to stop the analysis there. *See Jordan*, 73 F.4th at 1169.

> 3. How an otherwise lawful order may be rendered unlawful for purposes of the resisting/obstructing statute by the First Amendment

The Gradys have consistently argued that the orders they were given were unlawful[58] and the Defendants have argued that the orders were lawful under the First Amendment as well as under the Fourth Amendment. *See* ECF No. 69, PageID.1647. This case illustrates two potential analytical snags in "failure to comply" cases under resisting/obstructing statutes. The Gradys' Fourth Amendment and

---

[58] *See, e.g.*, ECF No. 75, PageID.4098.

First Amendment claims are intertwined in a way that makes the "lawfulness" of the order to back up difficult to parse. This is because, although an order to "back up" from a police perimeter may generally be a lawful one, that generality does not preclude the possibility that the order was nonetheless *un*lawful in *this* instance under the First Amendment (for example, if the order and their arrests were motivated by a desire to punish their First Amendment activity as Plaintiffs have alleged). *See Nieves v. Bartlett*, 587 U.S. 391, 414 (2019) (Gorsuch, J., concurring in part and dissenting in part) ("Here's a way to test the point[.] Everyone accepts that a detention based on race, even one otherwise authorized by law, violates the Fourteenth Amendment's Equal Protection Clause.").

Here are the snags: first, assume that the Defendant officers did in fact act to punish the Gradys' First Amendment activity. If their order was therefore unconstitutional, and accepting that the officers subjectively knew that they were taking unlawful action based on the Gradys' First Amendment activity, did the officers still have "objective" probable cause to believe that the Gradys failed to comply with a lawful order? Second: take motive out of the equation – assume that the order

"objectively" violates the First Amendment by restricting too much speech regardless of its message and regardless of the officers' motive. *See Swagler v. Sheridan*, 837 F. Supp. 2d 509 (D. Md. 2011). Does unlawfulness under either mode of First Amendment analysis matter for purposes of the Fourth Amendment's probable cause analysis when probable cause depends on the lawfulness of the order given?

The first snag is easier: no relevant case considers subjective motive, according with the understanding of probable cause as a plausible legal basis to arrest without reference to actual (and possibly unlawful) subjective First Amendment motive. *See Nieves*, 587 U.S. at 414 (Gorsuch, J., concurring in part and dissenting in part) (The point of evaluating motive in a First Amendment retaliatory arrest claim "isn't to guard against officers who *lack* lawful authority to make an arrest. Rather, it's to guard against officers who *abuse* their authority by making an otherwise lawful arrest for an unconstitutional *reason*.") (emphasis in original). "Courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official." *Fisher v. Harden*, 398 F.3d 837, 843 (6th Cir. 2005).

The second question is harder, though most courts agree that some form of lawfulness analysis is relevant. One possible interpretation: an order is not rendered unlawful by the First Amendment if the order can be fairly justified in reference to conduct rather than speech. In *Ordonez v. Gonzalez*, a Texas case, a plaintiff was similarly arrested while filming and criticizing police for interfering with police duties by failing to comply with an officer's instruction to back up. *See* No. EP-23-CV-99-KC, 2024 U.S. Dist. LEXIS 52632, at *20-21 (W.D. Tex. Mar. 25, 2024). When police spoke with the plaintiff's (Ordonez's) minor relative, Ordonez filmed the interaction with her phone. An officer told Ordonez that she could continue filming the police if she backed up, but there was no evidence that she complied with his instruction. The court concluded that the officer gave that instruction "within the scope of the official duty [he] was performing," and the "instruction concerned [] moving [back] rather than the content of [Ordonez's] speech." Accordingly, "[a] reasonable officer could have concluded that [Ordonez's] conduct constituted an interference that

went beyond speech."[59]  Therefore, probable cause existed.  Note the

distinction: the analysis does not depend on definitively concluding that

the restriction is one based on conduct and not speech or finding that

there was no First Amendment problem.  On a probable cause analysis,

if conduct alone can fairly explain the order and the effect on speech is

incidental, then that order would not offend the First Amendment.  *See*

*United States v. O'Brien*, 391 U.S. 367, 376, 88 S. Ct. 1673, 1678-79

(1968) ("[W]hen 'speech' and 'nonspeech' elements are combined in the

same course of conduct, a sufficiently important governmental interest

in regulating the nonspeech element can justify incidental limitations

on First Amendment freedoms[.]"); *see also Arcara v. Cloud Books, Inc.*,

478 U.S. 697, 706-07 (1986) ("[W]e have not traditionally subjected

every criminal and civil sanction imposed through legal process to 'least

restrictive means' scrutiny simply because each particular remedy will

have some effect on the First Amendment activities of those subject to

sanction.  Rather, we have subjected such restrictions to scrutiny only

where it was conduct with a significant expressive element that drew

---

[59] The phrasing reflects the test used when evaluating the speech/conduct
distinction for interfering with lawful duties in Texas.  *See Westfall v. Luna*, 903
F.3d 534, 544 (5th Cir. 2018).

the legal remedy in the first place, as in *O'Brien*, or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in *Minneapolis Star*").[60] Consider the example of *People v. Connolly*, Nos. 364104, 364105, 364106, 364107, 2024 Mich. App. LEXIS 4262, at *14 (Ct. App. May 30, 2024). In that case, anti-abortion protestors were arrested in a women's health clinic for their nonviolent failure to comply with police orders to disperse and leave the clinic (for trespassing on private property), and then to stand up and put their hands behind their backs. That court held that the "physical refusal to comply with a command" (and not just their vocal disagreement with that command) "undisputedly" violates § 750.81d. *Id.* at *14. There, the protestors' speech was separable from their failure to disperse, and their arrests could be justified without reference to their speech.[61]

---

[60] *O'Brien* and *Arcara* probably illustrate different doctrinal approaches (the former applying a low-level scrutiny, the latter applying no scrutiny at all). *See, e.g.*, Dan T. Coenen, *Free Speech and Generally Applicable Laws: A New Doctrinal Synthesis*, 103 Iowa L. Rev. 435, 442 (2018). On a probable cause analysis, however, that doesn't seem to be a crucial distinction – the nonspeech conduct is sufficiently explanatory to establish probable cause regardless of what level (if any) of scrutiny would applied to assess the order's ultimate constitutionality.

[61] The protestors do not appear to have raised a First Amendment speech/retaliation defense in their criminal case, and so the court is left to speculate

A second interpretation works a little differently; assuming that the order to "back up" to people filming police with their phones facially restricted speech and not just conduct, the "lawfulness" of that order could be scrutinized more closely under the First Amendment, but still only so far as that analysis can be made without reference to motive. *See, e.g.*, *Hulbert v. Pope*, 535 F. Supp. 3d 431 (D. Md. 2021).  In *Hulbert*, a gun rights group held a demonstration near the Governor's Mansion and were ordered to move off the sidewalk to the adjacent public lawn.  When they refused, officers arrested the leaders of the group.  Kevin Hulbert refused to move, filmed the arrests, and was then arrested too.  The district court held that as to Kevin, "even though it is clear that the restriction [to move off the sidewalk] was not content-based or intended to silence Plaintiffs' viewpoints[,]" there were "factual disputes requiring jury resolution as to whether a legitimate government interest was served by the police action[,]" and the order could therefore be "unconstitutional [on First Amendment grounds.]" *See id.* at 446, 449, 451.  If that were the case, "the failure to obey a

_____

as to the result.  Still, the probable cause established by their trespass onto private property would seem to be dispositive under *Nieves*.

lawful order statute cannot serve as the basis for probable cause." *Id.*
at 451 (quoting citation omitted).  That analysis, unlike *Ordonez*,
doesn't entirely set aside First Amendment scrutiny; it incorporates
First Amendment lawfulness as far as it can without reference to
subjective motive (whether a "significant government interest" was
served by a police action does not necessarily depend on whether the
action was intended to be hostile to a particular content or viewpoint).
*See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  The
Fourth Circuit reversed, but on grounds of qualified immunity; "a
reasonable officer in Pope's shoes could have believed that his orders for
the Hulberts to back up off the sidewalk were lawful time, place, or
manner restrictions on their speech.  It was therefore reasonable for
Pope to believe he had probable cause to arrest them for disobeying
these orders . . . ."  *Hulbert v. Pope*, 70 F.4th 726, 738 (4th Cir. 2023).  A
similar approach is illustrated in *Swagler v. Sheridan*, 837 F. Supp. 2d
509, 531 (D. Md. 2011).  In that case, an "order to leave Harford County
was clearly unconstitutional" on First Amendment grounds because
"the breadth of the [] order—'leave Harford County'—[] can satisfy
neither intermediate nor strict scrutiny as it left absolutely no

alternative methods for the Plaintiffs to exercise their First Amendment rights." *Id.* at 526, 531. "As such, the failure to obey a lawful order statute cannot serve as the basis for probable cause." *Id.* at 531; *see also Wright v. Georgia*, 373 U.S. 284, 291-92 (1963) ("[O]ne cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution.").

These two interpretations aren't irreconcilable. *Ordonez*, too, recognized that First Amendment unlawfulness is relevant when a command is obviously unconstitutional by completely banning speech. *See Ordonez*, 2024 U.S. Dist. LEXIS 52632, at *19-20 (when the officer's first order was to stop filming altogether, noting that "such a complete prohibition on filming would be beyond the scope of Gonzalez's authority, and therefore Ordonez's failure to comply did not furnish probable cause to arrest her for Interference with Public Duties"). A consistent throughline is that an order which plainly fails any First Amendment scrutiny would not provide probable cause to arrest a speaker for failure to comply with that order. *E.g.*, *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999) (filming a public meeting did not violate any law and was protected First Amendment activity, so police "lacked

the authority to stop them" and his failure to comply with commands to stop did not create probable cause).  In contrast, when an order debatably violates the First Amendment, like an ad hoc order to simply move to another nearby spot, the question of whether that triggers scrutiny or scrutinizing that order by evaluating "how many feet is too far" leads most courts to conclude that qualified immunity would protect the decision regardless of the answer.  *See Hulbert v. Pope*, 70 F.4th 726, 738 (4th Cir. 2023) (resolving arguable probable cause for the order's lawfulness as to time, place, and manner on qualified immunity grounds); *DeCastro v. Las Vegas Metro. Police Dep't*, No. 2:23-cv-00580, 2024 U.S. Dist. LEXIS 164883, at *32 (D. Nev. Sep. 12, 2024) (collecting cases); *cf. Jordan v. Adams Cty. Sheriff's Office*, 73 F.4th 1162, 1169 (10th Cir. 2023) (the First Amendment must "protect[] the right to remain in the area to be able to criticize the observable police conduct.").

The question in this case becomes how you frame the order to back up and move to another spot to keep filming: whether a) to apply forum analysis and intermediate scrutiny because the individuals in question were engaged in First Amendment activity in a public forum, and an

ad-hoc order to back up facially restricts their speech, or b) whether to

decline to apply First Amendment scrutiny in the Fourth Amendment

context because an objective officer would view any restriction on

speech incidental to a generally applicable conduct-based order that

could be given regardless of whether an individual was "speaking" and

regardless of whether the speaker was standing in a public forum or

not.  In this case, the latter framework is a better fit.  Under that view,

an order to "stop filming" or to "leave" the area would facially restrict

speech (or would effectively operate to prevent any possible speech), and

when directed at First Amendment activity, would plainly not have

been lawful to any reasonable officer; in contrast, an order that says

"you can videotape, but back up" is not plainly a First Amendment

violation.  Here, there is no dispute that police had essentially secured

the house, stationed officers around it, stationed an officer across the

street, and that their vehicles in the street barred street access to other

vehicles that might come by.  Plaintiffs make much of the fact that

there was no police tape put up, *see, e.g.*, ECF No. 75, PageID.4090, but

in the court's view, that alone is not sufficient to create a material

dispute that police created a rudimentary perimeter around the house.

How far police can extend a perimeter may be unclear as a matter of law, and factually, where precisely that perimeter might have been at the corner of 2714 Peachcrest's lawn is unclear.  Nonetheless, when the Gradys walked right to the edge of the property that police had surrounded with weapons out, stood in front of the patrol car parked in the street, and officers instructed them to back up and they did not, a police officer at the scene had enough information at their disposal to conclude that the Gradys had likely disobeyed a lawful order by entering the edge of their perimeter and refusing an order to back up outside of it.  *See Cheolas v. City of Harper Woods*, 467 F. App'x 374, 381 (6th Cir. 2012) ("Even if the Michigan courts would ultimately decide that this was too passive to support an actual conviction, it nonetheless was close enough to the line to satisfy the probable cause inquiry.").

Because probable cause existed to arrest the Gradys for their failure to comply with a lawful order, there was no violation of their Fourth Amendment right to be free from unlawful arrest, and Defendants are entitled to summary judgment on Plaintiffs' unreasonable seizure claim.

### ii.    *First Amendment Retaliation (Count I)*

Although probable cause existed under the Fourth Amendment, the court turns to Plaintiffs' retaliation claim and asks whether their arrests nonetheless violated the First Amendment.  To prevail on a First Amendment retaliation claim, Plaintiff must show that (1) the First Amendment protected their conduct; (2) an adverse action was taken against them that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by their protected conduct.  *Bell v. Johnson*, 308 F.3d 594, 602 (6th Cir. 2002) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).  The Gradys were arrested and jailed, and thus satisfy the second prong.  The first and third prongs merit more attention.

### a)    Protected Conduct

In the first step of the analysis, Plaintiffs must plead and prove that the First Amendment guaranteed their right to engage in the conduct that caused her arrest.  *Frenchko v. Monroe*, 672 F. Supp. 3d 421, 454 (N.D. Ohio 2024).

86

First, there is a constitutional right to film encounters with the police, at least while in public. *See Glik v. Cunniffe*, 655 F.3d 78, 84-86 (1st Cir. 2011) (finding a First Amendment right to film police officers performing their duties in public spaces); *Gericke v. Begin*, 753 F.3d 1, 7-10 (1st Cir. 2014) (same); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3rd Cir. 2017) (same); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688-90 (5th Cir. 2017) (adopting *Glik*); *ACLU v. Alvarez*, 679 F.3d 583, 595-96 (7th Cir. 2012) (allowing the audio recording of the police in public spaces); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (permitting the filming of police conduct subject to reasonable time place and manner restrictions); *Crawford v. Geiger*, 131 F. Supp. 3d 703, 714-15 (N.D. Ohio 2015) (concluding that "there is a First Amendment right to openly film police officers carrying out their duties in public"), *rev'd on other grounds*, 656 F. App'x 190 (6th Cir. 2016).

And second, it "is well-settled that the freedom to criticize public officials and expose their wrongdoing is a fundamental First Amendment value, indeed, [c]riticism of the government is at the very center of the constitutionally protected area of free discussion." *Wilkerson v. Warner*, 545 F. App'x 413, 424 (6th Cir. 2013) (quoting

*Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002)) (citation and quotes omitted). "There can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment." *McCurdy v. Montgomery Cty.*, 240 F.3d 512, 520 (6th Cir. 2001).

Further, Shatina and Daniel Grady's First Amendment activity occurred on a public sidewalk. Public streets and sidewalks are "are quintessential public forums for free speech." *Hill v. Colorado*, 530 U.S. 703, 715 (2000). But "even in a public forum, the government may impose a content-neutral time, place, or manner restriction if it is 'narrowly tailored to serve a significant governmental interest' and 'leave[s] open ample alternative channels' of communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Courts have applied these familiar principles to instances of spectators filming or criticizing police. *See Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (the right to film police "may be subject to reasonable time, place, and manner restrictions"); *Enoch v. Hamilton Cty. Sheriff's Office*, No. 22-3946, 2024 U.S. App. LEXIS 19255, at *12 (6th Cir. July 31, 2024)

(where plaintiff was recording in a court's hallways and arrested, holding that "[i]n a nonpublic forum like a courthouse, 'the First Amendment rights of everyone . . . are at their constitutional nadir.'") (quoting citation omitted); *Greene v. Barber*, 310 F.3d 889, 894 (6th Cir. 2002) ("Did Mr. Greene have a constitutionally protected right" to insult the defendant police officer? "The answer, we suggest, depends on the time, place, and manner in which Mr. Greene so expressed himself."). The problem is less whether these considerations apply and more how to apply them to ad hoc restrictions on speech; for example, asking "[h]ow close is 'too close' such that the filming," or perhaps other speech, "however well-intentioned, becomes hazardous, diverting officers' attention and impeding their ability to perform their duties in fast-moving, highly charged situations?" *See Buehler v. Dear*, 27 F.4th 969, 976 (5th Cir. 2022).

Here, public safety and security "are significant government interests." *Reform Am. v. City of Detroit*, 542 F. Supp. 3d 628, 639 (E.D. Mich. 2021). There remain the questions of whether the order was narrowly tailored or whether the order left open ample alternative means of expression. Both parties have addressed these points. *See*

ECF No. 69, PageID.1647; ECF No. 75, PageID.4099.  Speakers are "not entitled to [their] best means of communication." *Saieg v. City of Dearborn*, 641 F.3d 727, 740 (6th Cir. 2011) (citation omitted); *see also Hulbert v. Pope*, 535 F. Supp. 3d 431, 444 (D. Md. 2021) ("Regulations that merely limit an individual's activity to a portion of a forum usually are deemed to leave open ample alternative channels.") (collecting cases).  But "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience[,]" *Saig*, 641 F.3d at 740. (citation omitted).

Here, police told the Gradys to "back up" ("you can videotape, but back up") ("next house down, you'll be fine"), when they already stood about 20-30 feet away at the corner of the lot.[62]  It's not clear whether making Plaintiffs film with their phones from the "next house down" would in effect prevent their filming at that distance, or would unduly restrict their critical speech.  Plaintiffs point out that "Officers did not instruct Plaintiffs to go across the street where at least one other person was located[,]" though surely that doesn't foreclose the fact they could

---

[62] No testimony specifically addresses the exact distance; the court estimates based on the video, while noting that reasonable minds could reach a different number.  The point is that the Gradys posed no physical threat of interference by their nearness.

have done so, and other people were filming from that location.  *See*
ECF No. 75, PageID.4099.  It is also not totally clear why safety
concerns would require the Gradys to move to the "next house down"
but not require any other spectators to move (who were standing close
to the armed officers across the street).  *See, e.g.*, *Buehler v. Dear*, 27
F.4th 969, 977 (5th Cir. 2022) (police could lawfully order filming
activist to stand at *arms-length* when in a crowded street) (emphasis
added); *Perkins v. Hart*, No. 22-30456, 2023 U.S. App. LEXIS 31734, at
*19, 22 (5th Cir. Nov. 30, 2023) (While plaintiff's son filmed her arrest
in her driveway from *feet away* and shouted at officers and "was clearly
close to the arrest scene—the perimeter of which was being secured by
[police]—[he] was not a hazard, was not too close, and did not impede
the Deputies' ability to perform their duties.") (emphasis added).

    But those questions are ultimately not necessary to answer on this
motion.  Plaintiffs' retaliation claim here turns on the causation
element – whether the protected conduct was a motivating factor (but
for cause) of the arrest.  That element does not strictly depend on the
validity of this order as a reasonable time, place, or manner restriction
(though it would likely be relevant evidence).  That is, even if a jury

found that the order was a reasonable time, place, or manner restriction, they would still need to find that the arrests were motivated by Plaintiffs' speech in order for Plaintiffs to prevail on their retaliation claim.  And even if the jury found that the order was *not* a reasonable time, place, or manner restriction,[63] they would still need to find the same (though presumably, if an order was not in fact a reasonable restriction on speech, one could infer it may well have been made to restrict speech).  For this reason, both parties' arguments about the validity of the order as a time, place, and manner restriction are better considered factual questions for the jury to evaluate the strength of the content- and speech- neutral explanations for the Gradys' arrests.[64]

        b)     Causation

---

[63] A different question from whether an objective police officer could reasonably believe the order was lawful as time, place, or manner restriction.  *See Hulbert v. Pope*, 70 F.4th 726, 729 (4th Cir. 2023).

[64] To the extent that an unreasonable time, place, or manner restriction might establish an independent First Amendment violation (*see, e.g.*, *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1282 (D. Colo. 2018) (treating a retaliatory arrest claim separately from a "free speech" claim), *Hulbert v. Pope*, 535 F. Supp. 3d 431, 442 (D. Md. 2021) (alleging a violation of the right to film separately from their retaliatory arrest claim)), the only First Amendment claim here is a retaliatory arrest.  *See* First Amended Complaint, ECF No. 46, PageID.457.

Although the type of activity the Gradys were engaged in is of a sort that may be protected by the First Amendment, "the government's reason" for acting is "what counts[.]" *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016).  In this context, if the police acted only by enforcing a valid, content-neutral time, place, or manner rule, then their speech could be restricted consistent with the First Amendment. But an otherwise valid time, place, or manner restriction in a public forum must still be content and viewpoint neutral, and must be enforced as such to avoid closer scrutiny.  "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987).

The causation step of a retaliatory arrest claim asks whether the protected conduct was a motivating factor in the arrest.  "A 'motivating factor' is essentially [a] but-for cause . . . ." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007).  Although courts long considered it the case that "'claims involving proof of a defendant's intent seldom lend themselves to summary disposition' and 'circumstantial evidence may

provide sufficient evidence of retaliatory intent to survive summary judgment[,]'" *see, e.g.*, *Kennedy v. City of Villa Hills*, 635 F.3d 210, 218 (6th Cir. 2011) (citation omitted), a retaliatory arrest claim now generally fails when there is a showing of probable cause. *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019). According to the Supreme Court, "because probable cause speaks to the objective reasonableness of an arrest, its absence will—as in retaliatory prosecution cases—generally provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite." *Id.* at 402 (internal citation omitted).

However, *Nieves*'s presumption admits an exception: the existence of probable cause does not defeat a plaintiff's claim if he produces "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407.[65] The Court very recently addressed the

---

[65] For example, "[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest. In such a case, [] probable cause does little to prove or disprove the causal connection between animus and injury, . . . ." *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019). The example of a misdemeanor is not decisive; the exception

scope of this exception and cautioned against too narrow an application;
it is designed to account for "circumstances where officers have probable
cause to make arrests, but typically exercise their discretion not to do
so." *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (citing 587 U. S. at
406).  To fall within the exception, "a plaintiff must produce evidence to
prove that his arrest occurred in such circumstances.  The only express
limit we placed on the sort of evidence a plaintiff may present for that
purpose is that it must be objective in order to avoid 'the significant
problems that would arise from reviewing police conduct under a purely
subjective standard.'" *Gonzalez*, 602 U.S. at 658 (citing *Nieves*, 587 U.S.
at 407) (admonishing courts that "the demand for virtually identical
and identifiable comparators goes too far").

Defendants assert that Plaintiffs cannot qualify for the *Nieves*
exception because "the video evidence establishes that there was no
similarly situated individual at the scene."  ECF No. 69, PageID.1646.
To be clear, the video evidence plainly establishes that there were other
spectators at the scene, also filming the encounter, and (as *Nieves*

"applies to all offenses, including serious felonies[.]"  *Nieves*, 587 U.S. at 411 (2019)
(Thomas, J., concurring).

requires) were otherwise not engaged "in the same sort of protected speech" that Shatina Grady (and occasionally Daniel Grady) were engaged in (i.e. shouting at or criticizing police action, at least until the Gradys were arrested).  *See, e.g.*, Cratsenburg Bodycam at 46:20. Defendants argue, however, these people do not count as similarly situated individuals because the proper comparator would be people who also stood too close and "interfered with the investigation and refused commands to back up."  ECF No. 69, PageID.1646.

In the court's view, that is too narrow a scope to view potential comparators in this case in light of *Gonzalez*.  Differentiating the spectators in this case by drawing careful lines about precisely where they were standing in relation to the house is surely a search for "virtually identical" comparators, which the Court has instructed is not necessary or desirable.  *Gonzalez*, 602 U.S. at 658.  These other people also stood near police who were on active duty and were part of this same investigation/attempt to safely gain entry to the house (and these other spectators were even nearer to individual officers than the Gradys).  *See* ECF No. 69-5, PageID.1996-97; Cratsenburg Bodycam at 46:20; ECF No. 69-6, PageID.2281 (another officer had to be stationed

across the street because there "was people out and in the same area

that they were at").  These spectators also filmed the encounter from a

distance, and were not within the property itself.  That is sufficient to

establish their similarity at this stage.[66]

---

[66] Further evidencing that point, this case is coincidentally not far off from an example proposed by Justice Sotomayor in proposing how *Nieves* might operate in practice.  Her example:

> [S]uppose police respond to reports of a man prowling a front porch.  The man says that he is a locked-out homeowner; the police want ID.  The man alleges profiling; the officers insist they are just doing their jobs. Tempers flare.  A passerby, stepping into a next-door neighbor's yard for a clearer view of the confrontation, pulls out a cell phone camera and begins streaming video of the encounter to her social media followers.  One of the officers notices and orders the passerby to stop recording. When the passerby persists, the officer places the passerby under arrest for trespassing.  Will this citizen journalist have an opportunity to prove that the arrest violated her First Amendment rights?  **Under the majority's test, the answer seems to turn on how many other curious bystanders she can identify who were not arrested in a situation like hers**.  If she was one of a crowd to enter the neighbor's yard that night, she can sue using her readily available comparator neighbors.  But if she was keeping a lonely vigil, she is out of luck (unless she can find some other pool of comparable individuals)."

*Nieves*, 587 U.S. at 430 (Sotomayor, J., dissenting) (emphasis added).

Here, police similarly were investigating a neighboring house which attracted attention, and the Gradys and a small crowd of other people filmed from nearby (though in different spots).  Under *Nieves* and *Gonzalez*, the other bystanders in this case are relevant comparators.

Defendants' argument that what differentiates the Gradys is that they were told to back up is a question for the jury (and begs the question).[67] At the level of granularity that Defendants propose, they essentially just are rewording the causation question: could a reasonable jury credit the content-neutral explanation for their arrests and conclude that what differentiates the Gradys from other spectators at the scene is their location and mere failure to move back? Of course they could. Officers first warned the Gradys to "back up" before either of the Gradys ever said anything at all (though, viewed in the light most favorable to them at this stage, after they had started to film), suggesting that their critical speech had nothing to do with their arrests. Despite the many claims presented in this case, this is not a difficult thread to follow.

But could a jury also conclude that what differentiates the Gradys from other spectators, and what caused their arrests, is their vocal criticism of the police action? They could. A permissible, plausible, and reasonable inference that a jury could draw is that the Gradys were not

_____

[67] Justice Sotomayor's example also illustrates that the comparators need not have received the same order to be similarly situated. *See* note 66.

arrested for their failure to back up (when they already stood at a

distance) but for their alleged "interference" with the investigation by

shouting at police that they needed a warrant, and the resulting

frustration to police when the people inside the house subsequently

denied police entry without a warrant.  That motivation would violate

the First Amendment.  Plaintiffs have provided objective proof that

there were sufficiently similarly-situated individuals at the scene; it is a

question for a jury to decide which of the above explanations best

accounts for their differential treatment.  *DeCastro v. Las Vegas Metro.*

*Police Dep't*, No. 2:23-cv-00580-APG-EJY, 2024 U.S. Dist. LEXIS

164883, at *53 (D. Nev. Sep. 12, 2024) ("While a jury could reach the []

conclusion that none of those individuals was interfering

with police business the same way or under the same circumstances

DeCastro was, that is a matter for the fact finder.").

Having concluded that Plaintiffs have made their required

showing at the summary judgment stage, the court notes the other

evidence that would be in front of a jury to evaluate that question.  *See*

*Nieves*, 587 U.S. at 407-08 ("After making the required showing, the

plaintiff's claim may proceed in the same manner as claims where the

plaintiff has met the threshold showing of the absence of probable cause."); *id.* at 404 (in the absence of probable cause, "the *Mt. Healthy* test governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation.") (quoting citations omitted).  Evidence supporting Plaintiffs' case is available here: officers only proceeded to arrest the Gradys once the occupants refused to let them in without a warrant, consistent with what the Gradys were shouting.  Cratsenburg said "*she's* going" (referring to Shatina Grady) when he decided to order their arrests.  Cratsenburg Bodycam at 45:40 (emphasis added).  If the behavior at issue was both of the Gradys' failure to comply with the order to back up, that statement doesn't make much sense.  When explaining why they arrested the Gradys and no others, Pearson testified that "nobody [else] came close to our perimeter and entered in *and started yelling*, so they weren't interfering with our investigation."  ECF No. 69-5, PageID.2106 (emphasis added).  Cratsenburg also focused on Shatina Grady when explaining the reason to arrest; "*Attention was being*

*diverted* from the house *to Ms. Grady El*, and we needed to be focused

on the house and not outside interference."  ECF No. 69-6, PageID.2288

(emphasis added).  That's potentially a problem for the officers for a few

reasons: first, as the court noted above, if Shatina Grady's speech was

not actually physically disruptive, then it could not have been a

violation of § 750.81d.  *See People v. Morris*, 314 Mich. App. at 411

("[S]tate actors cannot under this statute arrest and convict persons for

only utilizing constitutionally protected words in opposition to the

actions of, for example, a police officer.").  Second, even if that

interpretation is possible, a jury could choose not to credit the

explanation of her speech as interference, because no officer ever

indicated trouble hearing in any of their bodycam footage, and the jury

could see for themselves that Buffa and the occupants of the house

continuing to converse throughout the Gradys' shouting without more

than a single momentary disruption.  Lastly, both officers testified that

speech ("yelling," "Ms. Grady-El") was a reason for arresting both

Gradys, but again, *Shatina* Grady's potentially disruptive speech

cannot serve as the basis for *Daniel* Grady's arrest.  Though Daniel did

yell comments at police a few times, no reasonable jury could find that

those comments moved beyond the kind of speech that is firmly protected under the First Amendment.

c)   Qualified Immunity

Officers are not entitled to qualified immunity if the constitutional right they violated "was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In the context of an arrest allegedly made absent probable cause, "[a]n officer is entitled to qualified immunity if he reasonably believed that the arrest was lawful, even if that belief was erroneous." *Wood v. Eubanks*, 25 F.4th 414, 421 (6th Cir. 2022) (citing *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020)).  In the Sixth Circuit, it is clearly established that filming police is protected by the First Amendment.  *Crawford v. Geiger*, 131 F. Supp. 3d 703, 714-15 (N.D. Ohio 2015) (concluding that "there is a First Amendment right to openly film police officers carrying out their duties in public"), *rev'd on other grounds*, 656 F. App'x 190 (6th Cir. 2016).  And criticism of police action is at the core of constitutionally protected free expression.  *See Wilkerson v. Warner*, 545 F. App'x 413, 424 (6th Cir. 2013); *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002).

In this case, Defendants argue that they are entitled to qualified immunity under *Nieves* because probable cause existed.  However, that plaintiffs must ultimately prove that officers acted with "subjective animus" in the First Amendment context reduces the concern that they will not know that their conduct violates the law.  *Nieves*, 587 U.S. at 401.  *Nieves* essentially creates an assumption for purposes of granting qualified immunity at pretrial stages when a plaintiff has no objective proof of improper motive, rather than changing any underlying substantive law establishing a First Amendment violation – it is still clearly established under *Nieves* that a retaliatory arrest made for the purpose of punishing speech violates the First Amendment, even if there was an "objective" (but pretextual) reason for the arrest, if police normally do not exercise their discretion to arrest for that conduct. Here, because Plaintiffs fall within the *Nieves* exception and there is objective evidence of improper motive, *Nieves*' default rule as to qualified immunity does not apply.[68]

_____

[68] Arguably, the *Nieves* framework simply does not work for a case like this, where so much of the possible probable cause arose from potentially "disruptive" and critical speech.  In such cases, the Sixth Circuit has suggested, "the general rule of requiring plaintiffs to prove the absence of probable cause should not apply" because the "broad reach" of an obstructing statute interpreted to include speech

Two more notes: the court has also explained why it is arguable whether probable cause existed to think that Shatina Grady interfered with police via her speech.  That factual dispute also explains why qualified immunity is not appropriate in this instance.  A "reasonable juror could conclude that no reasonable officer would perceive" Shatina Grady as physically interfering with their investigation merely by yelling from a distance.  *See Meadows v. City of Walker*, 46 F.4th 416, 424 (6th Cir. 2022); *People v. Morris*, 314 Mich. App. 399 (2016).  If the officers nonetheless arrested her or ordered her arrest based on her speech (as they testified), any reasonable officer so motivated should have "immediately" recognized the clearly established unlawfulness of arresting someone for the purpose of punishing their critical speech, when officers generally do not arrest people standing at a distance while only filming.  *See Nieves*, 587 U.S. at 407; *Blackwell v. Nocerini*, 123 F.4th 479, 492 (6th Cir. 2024) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (citation omitted), *Hartman v. Moore*, 547

"gives the police cover to retaliate against all kinds of speech under the banner of probable cause."  *Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019).  Because this case fits the *Nieves* exception, the court doesn't need to fully address that possibility.  But to any extent that the exception may not perfectly fit this case, that reasoning would explain why the case should nonetheless move forward on these facts.

U.S. 250 (2006)); *see also, e.g. Cain v. City of Detroit*, No. 12-15582, 2016 U.S. Dist. LEXIS 156999, at *20 (E.D. Mich. Nov. 14, 2016) (where there was an issue of fact of whether a vehicle impoundment was reasonable, denying qualified immunity because "[a] reasonable officer would have known that seizing a citizen's vehicle and ticketing him in response to his protestations against the officer's behavior, and demands for the officer's identification, would violate his First Amendment right to criticize police and be free from retaliation for doing so").

As to Daniel Grady, the protection of qualified immunity is also not appropriate. The court has explained why a jury could find that he was arrested not for his mere failure to comply with a content-neutral restriction, but because police associated him with loud vocal criticism from himself or Shatina Grady.[69]  Police were aware that Daniel Grady himself was making only a few critical comments, and no reasonable jury could find that *his* speech was physically disruptive. Accepting (at

---

[69] Whose speech actually might have motivated the arrest is unimportant here, so long as that critical speech was the basis of his arrest; if so motivated the action still violates the First Amendment. *See Heffernan*, 578 U.S. at 273 (First Amendment violation even though plaintiff had not actually engaged in any protected speech himself, because the government retaliated against his perceived speech).

this stage) that his arrest could have been caused by retaliatory motive, any reasonable officer subjectively entertaining that motive would have been aware of the unlawfulness of that arrest.

Therefore, qualified immunity does not apply as to the Gradys' First Amendment retaliation claim, and the motion for summary judgment on Count I is **DENIED**.

>          *iii.*        *Fourth Amendment (Excessive Force) (Count II)*

The Fourth Amendment's protection against unreasonable seizures also prohibits law enforcement officers from using excessive force against someone "in the course of an arrest, investigatory stop, or other 'seizure[.]'" *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "To determine if an officer's use of force violates the Fourth Amendment, courts apply an objective reasonableness standard, considering an officer's actions 'in light of the facts and circumstances

confronting them, without regard to their underlying intent or motivation.'" *Lunneen v. Village of Berrien Springs, Michigan*, 2023 WL 6162876, at *4 (6th Cir. Sept. 21, 2023) (quoting *Graham v. Connor*, 490 U.S. at 396-97). As explained in *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022), when considering the "totality of the circumstances" the Supreme Court has articulated three factors as a starting point: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 313 (6th Cir. 2017) (quoting *Graham*, 490 U.S. at 396). This list is not, however, exhaustive. *Palma*, 27 F.4th at 428-429 (citing *Roell v. Hamilton Cnty.*, 870 F.3d 471, 480 (6th Cir. 2017)); *see also Zuress v. City of Newark, OH*, 815 F. App'x 1, 6 (6th Cir. 2020) ("The *Graham* factors are not exhaustive."). "The test is 'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Griffith v. Coburn*, 473 F.3d 650, 656 (6th Cir. 2007) (quoting *Graham*, 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the

fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  A court "view[s] excessive force claims in segments." *Puskas v. Del. Cty.*, 56 F.4th 1088, 1094 (6th Cir. 2023) (citing *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)).

The Sixth Circuit does not appear to have conclusively ruled on whether the lawfulness of an arrest is relevant, but in keeping with the trends of sister circuits, district courts in this circuit have held that it is not.  *See Niewolak v. Bartynsky*, 615 F. Supp. 3d 652, 664 (E.D. Mich. 2022) (relying on the Second, Third, Seventh, Ninth, and Eleventh circuits, explaining that "the lawfulness of an arrest is irrelevant to an excessive force analysis") (citing *Sebright v. City of Rockford*, 585 F. App'x 905, 907 (7th Cir. 2014) (collecting cases)).  As Justice (then-Judge) Sotomayor explained in a 2006 case, "the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest." *Papineau v. Parmley*, 465 F.3d

46, 62 (2d Cir. 2006); *see also Est. of Sowards v. City of Trenton*, 125 F.

App'x 31, 41 (6th Cir. 2005) (holding that "the illegal entry into a

suspect's home by officers did not automatically expose those officers to

liability for any injuries that the suspect may have suffered as a result

of excessive force employed during the arrest.").

In the use-of-force context, "once the relevant set of facts is

determined and all reasonable inferences are drawn in favor of the

plaintiffs, to the extent supported by the record, the question of whether

the [officers'] actions were objectively unreasonable is 'a pure question

of law.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009)

(quoting *Scott v. Harris*, 550 U.S. at 381 n.8; and citing *Dunn v.

Matatall*, 549 F.3d 348, 353 (6th Cir. 2008)).  But "*if* there is some

evidence – more than a mere scintilla of evidence – that [the plaintiff],

through his conduct, judged from the perspective of reasonable officers

on the scene, did not give the officers probable cause to believe that he

posed a serious threat of harm, a genuine fact dispute is created."

*Chappell*, 585 F.3d at 909 (emphasis in original).

Here, the first two *Graham* factors weigh in Plaintiffs' favor.  The

severity of the Gradys' alleged crime – up until the moment of their

109

arrest – was, in the light most favorable to them, that they didn't back up some amount of feet from a police investigation, when they already stood about at the edge of the police perimeter and remained at a reasonable distance while making no movements toward the police.  At most, police had probable cause that they had failed to comply with the order to back up.  Failing to move from the perimeter would not indicate resistance justifying the use of a taser or of fist strikes.  *See Saalim v. Walmart, Inc.*, 97 F.4th 995, 1006 (6th Cir. 2024) ("[F]ailure to exit a vehicle is not active resistance and does not justify the use of a taser.") (quoting *Browning v. Edmonson Cnty.*, 18 F.4th 516, 527 (6th Cir. 2021)).  Second, the fact that the Gradys never changed their physical position and, at most, shouted at police, indicates that they never posed any immediate physical threat to officers before the officers moved to arrest them.  As WSCO's policies put it, "Verbal or psychological resistance generally does not cause an imminent threat to the safety of the officer or the public."  ECF No. 75-3, PageID.4134.  It is also clearly established that people who pose no safety risk to police have a right "to be free from gratuitous violence during arrest." *Gambrel v. Knox Cty.*, 25 F.4th 391, 403 (6th Cir. 2022) (citing *Shreve v. Jessamine Cty. Fiscal*

*Court*, 453 F.3d 681, 687 (6th Cir. 2006); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002)).

Once an arrest begins, however, a line is drawn between active and passive resistance to arrest. Active resistance "can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)); *Rudlaff*, 791 F.3d at 641. Mere passive resistance, in contrast, entails a "lack of physical resistance or verbal antagonism." *Jackson*, 678 F. App'x at 306; *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). "[W]hen individuals behave nonviolently and are merely noncompliant, this Court has found that they are only passively resisting arrest, which weighs against the reasonableness of a use of force." *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1005 (6th Cir. 2024). "Even repeated refusals to comply will not, by themselves, convert passive into active resistance." *Alston v. City of Detroit Police Officers*, 717 F. Supp. 3d 618, 631 (E.D. Mich. 2024) (citing *Eldridge*, 533 Fed. App'x at 535). But once the line into active resistance is crossed, Sixth Circuit cases "firmly

establish that it is not excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015); *see id.* at 643 ("[P]olice officers can tase someone who resists lawful arrest and refuses to move his hands so the police can handcuff him.") (citing *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (collecting cases)).

Although neither Grady presented a physical threat to police before their arrests, that determination may have reasonably changed during their arrests.  Here, there is no genuine, reasonable dispute that Shatina Grady and Daniel Grady actively resisted their arrest once it began, including Shatina biting her arresting officer.  Most critically to that analysis, Plaintiffs do not contest that they resisted arrest.  ECF No. 75, PageID.4102 (Plaintiffs' Response brief) ("Plaintiffs committed no crime in this case, Plaintiffs were not fleeing from the deputies but instead stayed in the same area, and lastly, Plaintiffs **were resisting** an unlawful arrest.") (emphasis added).  Nor could they reasonably contest it.

112

First, Shatina Grady.  The video and relevant testimony confirm that Grady physically resisted by fighting and bighting Pearson.  *See supra* notes 37-45 and accompanying text.  Pearson testified that he struck her on the head only to get her to stop biting him.  ECF No. 69-5, PageID.2036.  Her testimony that she cannot remember the incident, *see* ECF No. 69-9, PageID.2709, is insufficient to create a dispute of material fact in this instance.[70]  Daniel Grady's testimony is also not sufficient to create a dispute of fact in light of the video evidence.  *See* ECF No. 69-10, PageID.2918 (when asked "Did you see" Shatina Grady bite Pearson, Daniel Grady says "No.").  Fist strikes to get her to release her bite falls within the bounds of case law establishing a reasonable use of force, even if the arrest began for only a failure to back up.  *See Johnson v. City of Lincoln Park*, 434 F. Supp. 2d 467, 479–80 (E.D. Mich. 2006) (no excessive force when officer used taser to subdue individual who bit officer); *King v. United States*, No. 1:16-cv-343, 2017

---

[70] The video evidence showing the bite marks on Pearson's arm corroborates his testimony and no explicitly controverting testimony exists.  *See Wysong v. City of Heath*, 260 F. App'x 848, 858 (6th Cir. 2008) ("Wysong could raise a fact question through his own testimony, but he cannot because admits to not remembering the relevant events.").

U.S. Dist. LEXIS 215640, at *26-27 (W.D. Mich. Aug. 24, 2017) (same). Therefore, her excessive force claim cannot stand.

Daniel Grady's arrest warrants more attention.  The video and relevant testimony also confirms that Daniel Grady likely did more than just passively resist; a struggle ensues when Cratsenburg goes to arrest him.  *See* Cratsenburg Bodycam at 46:51.  However, because it is not clear what is happening, in the light most favorable to Mr. Grady, his resistance could have consisted of tensing his arms and pulling away and thereby preventing Cratsenburg from handcuffing him, but not fighting back or pushing Cratsenburg away.  Still, the Sixth Circuit has recently reaffirmed that even that kind of action counts as active resistance.  "If an arrestee kicks, flails, and wriggles away from an arresting officer's grasp, or repeatedly pulls his left arm away from an officer's handcuffs, officers may use a taser to restrain him."  *Moore v. Oakland Cty.*, No. 24-1563, 2025 U.S. App. LEXIS 1473, at *8 (6th Cir. Jan. 23, 2025) (recommended for publication) (quoting *Roell v. Hamilton County*, 870 F.3d 471, 482-83 (6th Cir. 2017); *Bell v. City of S.field*, 37 F.4th 362, 368 (6th Cir. 2022)) (cleaned up).

Even so, consideration of the other *Graham* factors makes the use of a taser seem unreasonable.  Daniel Grady's alleged crime consisted of, in full, not backing up while he stood on a public sidewalk, about 20-30 feet away from a house that police had secured, with his phone out. Police escalated the encounter by arresting him; in the course of that arrest where he tried to avoid being handcuffed, they tased him.  At the moment he was tased, he was not touching any officer, nor does he appear to be attempting to approach an officer, or attempting to flee – he just stands there.  *See* Cratsenburg Bodycam at 46:58-47:02. Perhaps more importantly, Cratsenburg tells Grady, "Let go or you're going to get tasered," and Grady is either pushed off or relinquishes his grip.  Another officer steps in between Grady and Cratsenburg and apparently pushes Grady backward again.  See Cratsenburg Bodycam at 46:57 (warning), 47:04 (taser).  With the video inconclusive, in the light most favorable to Grady a jury could find that he essentially complied with the order to let go and backed off, and then was tasered at the moment that he no longer posed a physical threat to officers.  The reasonableness of that taser use, segmented to that moment, is in this court's opinion debatable by a reasonable jury.  *See, e.g., Greene v.*

*Barber*, 310 F.3d 889, 897 (6th Cir. 2002) (where under *Graham* factors plaintiff was not attempting to flee, crime was low-level disturbance in public place, but he actively resisted arrest, use of pepper spray "might be found to have constituted excessive force").

However, although that factual finding could establish a constitutional violation, binding language permitting taser use against actively resisting arrestees makes the application of qualified immunity appropriate in this instance. Daniel Grady admits that his conduct became active resistance, and although his alleged crime was a minor one, his conduct "does not fit cleanly within" existing excessive force case law and he cannot overcome the clearly established hurdle of qualified immunity. *See King v. City of Rockford*, 97 F.4th 379, 397 (6th Cir. 2024) (citing *Rudlaff*, 791 F.3d at 644 (second quoting citation omitted)); *Ryan v. City of Hazel Park*, 279 F. App'x 335, 338 (6th Cir. 2008) ("This Court has held that officials are entitled to qualified immunity in the face of excessive force allegations even when the plaintiff 'was suspected of relatively minor crimes' if the plaintiff resisted and the officials responded with force.")

The Gradys, for their part, don't truly present many arguments against any of the court's conclusions above; their argument instead comes down to their claim that a) they committed no crime, b) officers failed to de-escalate the situation, and c) they retain the right to resist an unlawful arrest under Michigan law.  *See* ECF No. 75, PageID.4102.  The court has already addressed their first and second arguments in discussion of the *Graham* factors.  As to their third (and more central) argument, although individuals do possess a common law right to resist unlawful arrest in Michigan, *see People v. Moreno*, 491 Mich. 38, 57 (2012), the court "has been unable to locate any decision, reported or otherwise, in which that principle was used to overcome qualified immunity in a suit to recover damages for the application of allegedly excessive force, rather than as a defense to a charge of resisting arrest." *See Davis v. Walleman*, 596 F. Supp. 3d 877, 892 n.3 (E.D. Mich. 2022).  Lacking any authority suggesting that could be the case, the court will not find so here.[71]

---

[71] Plaintiffs' citation to *Derowitsch v. Granger*, 783 F. App'x 979 (11th Cir. 2019) is inapposite.  *See id.* at 984 (if "an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, [and] the excessive force claim is entirely derivate of, and is subsumed within, the unlawful arrest claim.").  Not only does that not fully capture a challenge to the

Because the Gradys have conceded that they resisted arrest, the facts confirm that they did so, and they present no case law establishing a right to resist unlawful arrests under the Fourth Amendment, Defendants are entitled to summary judgment on Plaintiffs' excessive force claims.

> iv.    *Fourteenth Amendment (Equal Protection and Due Process) (Count II)*

Having determined that Plaintiffs' unreasonable seizure and excessive force claims under the Fourth Amendment fail as a matter of law, the court turns to the remaining claims under Count II under the Fourteenth Amendment.

Defendants argue that the existence of probable cause and qualified immunity puts Plaintiffs' due process Fourteenth Amendment claims beyond debate.  *See* ECF No. 69, PageID.1649.  They also claim that Plaintiffs' equal protection claim fails because the officers did not treat the Gradys differently from similarly situated persons.  ECF No. 69, PageID.1650.  However, as Defendants also argue, a more

---

reasonableness of the force used, but it otherwise would cause their claim to be subsumed under either their Fourth Amendment claim or First Amendment claim.

fundamental problem underlies Plaintiffs' alleged due process claim. "If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment," not the Fourteenth Amendment's due process clause. *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017). Plaintiffs' claims of unlawful arrest sound in the Fourth Amendment, not the Due Process Clause. *See* ECF No. 75, PageID.4095.

As to equal protection, that principle "must coexist with the practical necessity that most [government action] classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). As a result, if an action or law "neither burdens a fundamental right nor targets a suspect class," differential treatment should be upheld "so long as it bears a rational relation to some legitimate end." *See id.* Here, plaintiffs have not argued that they were treated differently based on a suspect class, nor that a fundamental right was burdened. To the extent that plaintiff has alleged a burden on their fundamental First Amendment rights, that claim is captured by their retaliation claim.

"Where a particular Amendment 'provides an explicit textual source of
constitutional protection' against a particular sort of government
behavior, 'that Amendment, not the more generalized notion of
'substantive due process,' must be the guide for analyzing' such a
claim." *Albright v. Oliver*, 510 U.S. 266, 268 (1994) (citing *Graham v.
Connor*, 490 U.S. 386).   Instead Plaintiffs argue that they were "treated
differently than other persons who were similarly situated and that
there exists no rational basis for such disparate treatment[,]" known as
a "class of one" claim.   ECF No. 75, PageID.4100; *see Village of
Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quotation marks
omitted).   But in the context of this case, when Plaintiffs argue that
they were arrested without rational legal basis, they functionally argue
that they were arrested without probable cause compared to other
spectators and neighbors who were not arrested.   Without needing to
address who the proper comparator class is under an equal protection
view, it is sufficient to state that "[p]robable cause is a rational basis for
official action." *Avila v. Pappas*, 591 F.3d 552, 554 (7th Cir. 2010).
Here, probable cause existed and no suspect class is implicated, and so
their equal protection arguments fail as a matter of law.

Defendants are therefore entitled to summary judgment on the Due Process and Equal Protection claims on the basis that their due process claim properly sounds in Plaintiffs' Fourth Amendment claim, any fundamental right claim sounds in the First Amendment, and a rational basis existed for their arrests.

As a result, Defendants' motion is **GRANTED** as to all claims under Count II.

### v.    *Eighth Amendment (Count III)*

Plaintiffs have conceded in their written brief that their Eighth Amendment claims should be stricken, ECF No. 75, PageID.4100, and thus Defendants' Motion is **GRANTED** as to Count III.

### C.    **Claims under state law**

### i.    *False Imprisonment (Count IV)*

False imprisonment is defined as an unlawful restraint on a person's liberty or freedom of movement. *Clarke v. K-Mart Corp*, 197 Mich. App. 541, 546 (1993). To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause. *Lewis v. Farmer Jack, Inc*, 415 Mich. 212, 218 (1982); *e.g. Peterson Novelties, Inc. v. City of Berkley*,

259 Mich. App. 1, 17-18 (2003).  Because probable cause existed, this claim fails as a matter of law and the Defendants' motion for summary judgment is **GRANTED** as to Count IV.

   *ii.*   *False Arrest (Count V)*

  Under Michigan law, the terms false arrest and false imprisonment are interchangeable.  *Lewis v. Farmer Jack Div., Inc.*, 415 Mich. 212, 232 (1982).  "[F]alse arrest and false imprisonment are not separate torts, and a false arrest is one way to commit false imprisonment; since an arrest involves a restraint, it always involves imprisonment."  *Id.* at 231 n.4 (quoting 32 Am. Jur. 2d, False Imprisonment, § 2, at 59-60); *see Ratcliff v. City of Detroit*, No. 2:19-cv-13458, 2021 U.S. Dist. LEXIS 133736, at *9 (E.D. Mich. July 19, 2021).  Therefore, for the reasons stated above, the motion is likewise **GRANTED** as to Count V.

   *iii.*   *Assault and Battery (Count VI)*

  Assault and battery claims under Michigan law share some similarities with Fourth Amendment excessive force claims.  *See Rideout v. Shelby Twp.*, 691 F. Supp. 3d 816, 834 (E.D. Mich. 2023) ("Arresting officers may use reasonable force to effectuate a lawful

arrest.") (cleaned up, quoting citation omitted); *Webb v. City of Taylor*, No. 236153, 2002 Mich. App. LEXIS 1911, at *9 (Ct. App. Dec. 3, 2002) (but "if the force used is excessive, a police officer may be held liable for assault and battery despite the validity of the arrest.") (citations omitted). Two differences are relevant to this case: first, under state law, a claim for assault and battery can lie even where reasonable force was used if a plaintiff was unlawfully arrested (though whether the "lawfulness" is just a matter of objective probable cause or includes other constitutional defects is likely arguable). *See People v. Eisenberg*, 72 Mich. App. 106, 111 (1976) ("An unlawful arrest is nothing more than an assault and battery against which the person sought to be restrained may defend himself as he would against any other unlawful intrusion upon his person or liberty."). Second, state law immunity differs slightly from the qualified immunity analysis. If a plaintiff pleads an intentional tort against a government official, the court must determine whether the defendant established that he is entitled to individual governmental immunity by showing, among other things, that "the acts were undertaken in good faith, or were not undertaken with malice[.]" *Odom v. Wayne Cty.*, 482 Mich. 459, 480 (2008).

Here, the court has already analyzed whether the force was excessive in the context of Plaintiffs' Fourth Amendment claims. Two issues thus remain: first, whether the possible unlawfulness of their arrests under the First Amendment changes the result as to Shatina Grady's state law assault and battery claim, and second, whether governmental immunity would protect the officers regardless. The parties' focus on the second question resolves the claim without needing to answer the first.

Defendants claim that "the Gradys can point to no evidence of bad faith," and therefore the Defendants would be entitled to governmental immunity. ECF No. 69, PageID.1649 (citing *McColman v. St. Clair Cnty.*, 2010 WL 4483389, at *15 (E.D. Mich. Nov. 1, 2010) (the plaintiff showed "absolutely no evidence" that the deputy acted in bad faith). Plaintiffs respond that "[a]n officer lying about his basis for arrest would be 'strong evidence of malice[,]'" and that "occurred here both at the preliminary exam and at trial." ECF No. 75, PageID.4103 (citing *Romo v. Largen*, 723 F.3d 670, 676 (6th Cir. 2013). In other words, Plaintiffs argue that the officers lied in their testimony regarding probable cause because they allegedly lied about there being a

perimeter set up, and the resulting lack of probable cause made the arrest unlawful.  Here though, while the court has agreed that there is a material factual dispute as to the officers' actual motive in arresting Plaintiffs, the court has concluded that there was an objective, valid basis for arrest available to officers for the Gradys' failure to back up, even if they did not put up police tape to clearly mark the perimeter. Because that is Plaintiffs' sole argument defending their state law claims, and the court disagrees that those statements alone establish malice relevant to an assault and battery claim, Plaintiffs have not provided the court any reason to depart from its conclusions as to Plaintiffs' Fourth Amendment excessive force claims.  *See King v. City of Rockford*, 97 F.4th 379, 400 (6th Cir. 2024) ("While the good-faith element in the [Michigan] government immunity context is subjective, the application of immunity largely tracks the application of qualified immunity in the § 1983 context.").

Defendants' motion is therefore **GRANTED** as to Count VI.

iv.    *Intentional Infliction of Emotional Distress ("IIED") (Count VII)*

The elements of intentional infliction of emotional distress ("IIED") are (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Roberts v. Auto-Owners Ins Co*, 422 Mich. 594, 602 (1985). "The threshold for showing extreme and outrageous conduct is high," and "[n]o cause of action will necessarily lie even where a defendant acts with tortious or even criminal intent." *VanVorous v. Burmeister*, 262 Mich. App. 467, 481 (2004). A police officer executing an arrest supported by probable cause does not act in an extreme or outrageous manner. *Walsh v. Taylor*, 263 Mich. App. 618, 634 (2004) (holding that because the officer established probable cause to arrest the plaintiff, "as a matter of law he cannot be liable for intentional infliction of emotional distress."); *see also Fleming v. Scruggs*, 465 F. Supp. 3d 720, 748 (E.D. Mich. 2020) (citing *Henderson v. Jackson*, No. 15-10807, 2016 U.S. Dist. LEXIS 72506, 2016 WL 3125214, at *12 (E.D. Mich. June 3, 2016)) ("The plaintiff has presented ample evidence that Jackson intended to cause *physical* injury upon Henderson, but there is no evidence that the defendant intended to inflict emotional trauma. . . . ") (emphasis in original) (citation omitted)). "[F]ederal courts generally hold that a

claim for IIED is made out only where the defendant procured an arrest and ensuing charges knowingly based on false or fabricated evidence." *Akima v. Peca*, 652 F. Supp. 3d 848, 864 (E.D. Mich. 2023).

Probable cause existed to arrest Plaintiffs, and Plaintiffs have not presented any specific arguments in response to Defendants' motion for summary judgment on their IIED claim. Again, the only argument on point in Plaintiffs' response appears to be that government immunity does not apply because "Defendants, mainly Pearson and Cratsenburg acted with malice . . . [by] lying about [the] basis for arrest . . . ." But as explained above, their testimony as to their motive for arresting Plaintiffs does not prevent there having been probable cause, and Plaintiffs have not explained how or why these statements could or should still be considered malicious, false, or fabricated evidence if there was objective probable cause. Defendants are therefore entitled to governmental immunity and summary judgment on the IIED claim, and their motion is likewise **GRANTED** as to Count VII.

## V.    CONCLUSION

Therefore, the Court **GRANTS** the motion for summary judgment as to Counts II, III, IV, V, VI, and VII, but **DENIES** the motion as to

Count I (First Amendment retaliation) for both Plaintiffs.  Defendant

Buffa is **DISMISSED** from the case in full.

This is not a final order and does not close the case.  A scheduling

order for a trial and remaining pretrial dates will be issued.

**SO ORDERED**.


Date: March 7, 2024                    s/F. Kay Behm
                                       F. Kay Behm
                                       United States District Judge